# 23-7310

## United States Court of Appeals
## for the Second Circuit

JUSTIN MCCLARIN,

*Plaintiff-Appellee,*

*against*

THE CITY OF NEW YORK, POLICE DAVID GRIECO, POLICE
OFFICER MICHAEL ARDOLINO, DAVID QUATTROCHI, SGT.
ROBERT MARTINEZ, and WILLIAM SCHUMACHER,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of New York

## BRIEF FOR APPELLANTS

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for Appellants
100 Church Street
New York, New York 10007
212-356-0852 or -0817
lobrien@law.nyc.gov

RICHARD DEARING
DEVIN SLACK
LAUREN L. O'BRIEN
*of Counsel*

January 18, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

PRELIMINARY STATEMENT.............................................................. 1

JURISDICTIONAL STATEMENT ......................................................... 3

ISSUES PRESENTED FOR REVIEW ..................................................... 3

STATEMENT OF THE CASE ................................................................ 4

    A. The undisputed evidence that a family member reported
       that Miranda was being held against her will and beaten
       by McClarin.................................................................................. 6

    B. The parties' otherwise competing accounts at trial .................. 8

    C. The district court's exclusion of audio recordings
       capturing McClarin promising Miranda hundreds of
       thousands of dollars to testify at trial ..................................... 13

    D. The district court's jury instructions, the verdict, and the
       officers' post-trial motion ......................................................... 16

SUMMARY OF ARGUMENT  AND STANDARDS OF REVIEW ......... 20

ARGUMENT .................................................................................... 23

POINT I ........................................................................................... 23

    THE OFFICERS ARE ENTITLED TO JUDGMENT AS A
    MATTER OF LAW ON MCCLARIN'S UNLAWFUL ENTRY
    CLAIM .......................................................................................... 23

POINT II........................................................................................... 28

# TABLE OF CONTENTS (cont'd)

**Page**

THE OFFICERS ARE ENTITLED TO A NEW TRIAL IN
ANY EVENT ..............................................................28

A.  The district court erred in excluding compelling, recently
discovered impeachment evidence going to the heart of
McClarin's case. ...................................................29

B.  A series of overlapping errors on McClarin's malicious
prosecution claim provide a separate basis for a new trial
on that claim. ......................................................37

  1. The district court failed to provide a proper causation
  instruction to the jury. ..........................................39

  2. The district court failed to provide a probable cause
  charge appropriately tailored to the case. ...........................40

  3. The district court erred in failing to ask the jury to
  specify the charges it found were unsupported by
  probable cause. .................................................43

CONCLUSION ..................................................46

CERTIFICATE OF COMPLIANCE......................................47

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011)................................................................27

*Batt v. Buccilli,*
  725 F. App'x 23 (2d Cir. 2018) ............................................28

*Brady v. Wal-Mart Stores, Inc.,*
  531 F.3d 127 (2d Cir. 2008) .................................................21

*Calhoun v. Walmart Stores E., LP,*
  818 F. App'x 899 (11th Cir. 2020).......................................32

*Cameron v. City of New York,*
  598 F.3d 50 (2d Cir. 2010) ...................................................40

*Cash v. Cnty. of Erie,*
  654 F.3d 324 (2d Cir. 2011) .................................................20

*Chamberlain v. City of White Plains,*
  960 F.3d 100 (2d Cir. 2020) .................................................24

*Chiaverini v. City of Napoleon,*
  No. 21-3996, 2023 U.S. App. LEXIS 865 (6th Cir. Jan. 11,
  2023)..........................................................................................41

*Chiaverini v. City of Napoleon,*
  No. 23-50, 2023 U.S. LEXIS 4915 (Dec. 13, 2023) ............41

*Coleman v. City of N.Y.,*
  688 F. App'x 56 (2d Cir. 2017) ............................................38

*Deitrick v. Costa,*
  849 F. App'x 370 (3d Cir. 2021) ..........................................32

iii

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Gordon v. N.Y.C. Bd. of Educ.*,
    232 F.3d 111 (2d Cir. 2000) ............................................................... 42

*Hoyos v. City of N.Y.*,
    650 F. App'x 801 (2d Cir. 2016) ......................................................... 38

*Jones v. Treubig*,
    963 F.3d 214 (2d Cir. 2020) ............................................................... 44

*Ling-Rong Chen v. City of Syracuse*,
    385 F. App'x 41 (2d Cir. 2010) ........................................................... 31

*Mendoza v. Nordstrom, Inc.*,
    778 F.3d 834 (9th Cir. 2015) .............................................................. 42

*Michigan v. Fisher*,
    558 U.S. 45 (2009) (per curiam) ................................................... 24, 25

*Outley v. New York*,
    837 F.2d 587 (2d Cir. 1988) ............................................................... 35

*Patterson v. Balsamico*,
    440 F.3d 104 (2d Cir. 2006) ............................................................... 32

*Posr v. Doherty*,
    944 F.2d 91 (2d Cir. 1991) ........................................................... 20, 44

*Scruggs v. United States*,
    No. 95-5317, 1995 U.S. App. LEXIS 24664 (6th Cir. Aug.
    10, 1995) ............................................................................................ 34

*Stephenson v. Doe*,
    332 F.3d 68 (2d Cir. 2003) ................................................................. 27

*Tierney v. Davidson*,
    133 F.3d 189 (2d Cir. 1998) ............................................................... 24

iv

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*United States v. Figueroa,*
    548 F.3d 222 (2d Cir. 2008) ................................................ 30

*United States v. Klump,*
    536 F.3d 113 (2d Cir. 2008) ................................................ 24

*United States v. Rosa,*
    11 F.3d 315 (2d Cir. 1993) ................................................. 36

*United States v. Stewart,*
    907 F.3d 677 (2d Cir. 2018) ................................................ 36

*Velez v. City of N.Y.,*
    730 F.3d 128 (2d Cir. 2013) ................................................ 21

*Walker v. Sankhi,*
    494 F. App'x 140 (2d Cir. 2012) ....................................... 38, 40

## Statutes and Rules

Fed. R. App. P. 4(a)(1)(A) ...................................................... 3

Fed. R. Evid. 613(b) .............................................................. 34

Fed. R. of Civ. Pro. 26(a)(3)(A) ............................................. 31

28 U.S.C. § 1291 ................................................................... 3

28 U.S.C. § 1331 ................................................................... 3

28 U.S.C. § 1343 ................................................................... 3

28 U.S.C. § 1367 ................................................................... 3

42 U.S.C. § 1983 ................................................................ 3, 5

## PRELIMINARY STATEMENT

Plaintiff Justin McClarin was arrested following reports that he was holding a woman—later identified as Samantha Miranda—against her will in a basement and beating her. In this § 1983 action, a jury found for McClarin on his Fourth Amendment claims for unlawful entry and malicious prosecution, awarding him damages of nearly $900,000. The United States District Court for the Eastern District of New York (Block, J.) denied the defendant-officers' post-trial motions.

This Court should reverse. To start, the officers are entitled to judgment on the unlawful entry claim because the only conclusion available on this record is that exigent circumstances were present and justified any warrantless entry. In the alternative, qualified immunity applies. The undisputed facts at trial show that there was probable cause to believe that Miranda was in danger or threatened with serious injury. A 911 report indicated that a woman was being held against her will and subjected to an ongoing assault; officers spoke with the 911 caller, a close relative of Miranda, who confirmed that McClarin was holding Miranda against her will in a basement, beating her, and forcing her to urinate in

cups; and the relative supplied officers with text messages from McClarin that were consistent with her account.

That aside, a new trial is required on McClarin's claims for unlawful entry and malicious prosecution. First, the district court made a grave mistake in excluding impeachment evidence uncovered a week or two before trial: recordings of conversations in which McClarin promised Miranda hundreds of thousands of dollars to testify, demonstrating that McClarin had repeatedly given false testimony and showing that Miranda had a financial stake in ensuring that McClarin prevailed. The purported basis for exclusion—that the officers had to identify the recordings in pretrial disclosures—misapprehends the governing rules, which exempt impeachment evidence from disclosure. And even if pretrial disclosure had been required, excluding evidence of this caliber was an unwarranted step that profoundly damaged the officers' defense.

Second, the district court made a series of interconnected errors when putting the malicious prosecution claim to the jury. The jury was never asked to weigh in on the core causation question, and this Court has been denied the information needed to assess whether the absence of probable cause for one or more charges caused an independent seizure.

2

## JURISDICTIONAL STATEMENT

The district court had original subject-matter jurisdiction over McClarin's 42 U.S.C. § 1983 claims under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over his state-law claims under 28 U.S.C. § 1367 (Appendix ("A") 31). This Court has jurisdiction over this appeal from the final judgment under 28 U.S.C. § 1291 (Special Appendix ("SPA") 26-27). The appeal is timely because the final judgment was entered on September 11, 2023 (SPA27), and the officers noticed their appeal on October 5, 2023 (A2134). *See* Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED FOR REVIEW

1.     Are the officers entitled to judgment as a matter of law on McClarin's unlawful entry claim, where undisputed evidence at trial provided probable cause to believe Miranda was in danger or threatened with serious injury, providing exigent circumstances that justified any warrantless entry or at least entitling defendants to qualified immunity?

2.     Are the officers entitled to a new trial on the unlawful entry claim (if not resolved as a matter of law) and the malicious prosecution claim, where the district court (a) excluded compelling impeachment evidence based on a phantom rule violation and the absence of any

3

prejudice to McClarin, and (b) made multiple interrelated errors when putting the malicious prosecution claim to the jury?

## STATEMENT OF THE CASE

Justin McClarin was arrested in the wee hours of December 13, 2015, based on reports that he was holding a young woman—later revealed to be Samantha Miranda—against her will and beating her in a basement apartment, and the officers found Miranda there, badly bruised (A501). The district attorney, exercising independent authority, charged McClarin with a number of crimes, including five felonies sounding in kidnapping, unlawful imprisonment, and criminal possession of a controlled substance (A501, 510, 1574).

McClarin was detained for a total of five days between his arraignment (he did not make the bail set) and a grand jury hearing, at which no indictment was issued (A1197-99, 1202). McClarin was not required to make any court appearances post-arraignment (A1201).

McClarin brought this action against the City of New York and five individual officers: Michael Ardolino, David Grieco, Robert Martinez, David Quattrochi, and William Schumacher (A102).[1] In a summary

---

[1] Though the City is identified as an appellant, the judgment does not run against it.

4

judgment ruling that McClarin has elected not to challenge on appeal, the district court dismissed his false arrest claim, finding there was at least arguable probable cause to arrest based on the reports that Miranda was being held against her will and on Miranda's observable injuries (A665-67). The court also dismissed the majority of McClarin's excessive force claims and his *Monell* claim against the City (A667-68, 671-72).

The case went to trial and three sets of § 1983 claims were put the jury: (1) a Fourth Amendment unlawful entry claim against Ardolino, Grieco, and Martinez—sometimes said to be for an unlawful "search," though the only question put the jury was whether there were exigent circumstances to enter the apartment (A2068-69); (2) a Fourth Amendment malicious prosecution claim against Ardolino and Grieco, and a related failure to intervene claim against Martinez and Schumacher, which for simplicity's sake we will refer to together as the malicious prosecution claim; and (3) an excessive force claim against Quattrochi (A785-88). The jury also considered a state-law assault and battery claim paralleling the excessive force claim.

5

## A. The undisputed evidence that a family member reported that Miranda was being held against her will and beaten by McClarin

The following facts were undisputed at the six-day trial. At about 12:30 a.m. on December 13, 2015, the NYPD received a 911 call that a woman was then being assaulted on Warwick Street in Brooklyn and that the assault was ongoing (A1469-70). It received another call that a close relative of the caller had been held against her will and beaten (A1323).

Officer Ardolino then spoke with the caller, Samantha Miranda's aunt, over the phone about her report, and a number of officers went to speak with her in person (A1323). She corroborated the initial reports, confirming that McClarin was holding her niece against her will, and that he was beating and drugging her (A1324). Miranda's aunt showed officers a text message in which McClarin told her he would "keep [Miranda] till she starts withdrawing then I'll bring her to u ... that's the most I can do" (A1034). When the aunt asked in the exchange if McClarin was going to beat her, calling him a "women beater," McClarin responded, "Lol, maybe, maybe not, ain't nooooo tellin" (A1034-35, 1324).

Soon afterward, the officers were temporarily sidetracked by a gun found in the trunk of a car after they observed two men with an open

6

container of alcohol (A1625-27). Schumacher and Quattrochi arrested the two men and officers took them, along with the car and the gun, to the police precinct (A1332, 1627-28, 1658). The time that elapsed between taking the men to the precinct and returning to the scene "wasn't long"— less than two hours—because "[t]he locations are very close" (A1335).

The officers arrived at 393 Warwick Street at around 3:00 a.m. (A1151, 1417). Inside, the officers found Miranda with dark bruises covering her face, neck, and arms (A1384, 1630, 1730), and saw a boiler room in which she had been urinating in cups and three empty milk cartons and washing herself in aluminum trays of dirty water (A1037, 1130, 1382, 1565). The officers vouchered a bin containing bullets, a scale used for drugs, four ounces of crack cocaine, and cell phones (A1556, 1572). Photographs depicted Miranda's bruises and the condition of the apartment, in which garbage and other items were strewn across the floor (A1384, 1424-28, 1555).

McClarin was arrested at 3:30 a.m. (A1042). Miranda went with the officers to the police precinct, where she wrote by hand the following sworn statement:

> I was being held for 2 months, forced to use the bathroom in cups, and had to shower in a boiler

7

room in aluminum trays. If I got away, he would find me and tell me I had to go back. He abused me, hitting me, punching. He, Justin McClarin would sit in front of [the] door and not let me leave. Justin McClarin would break my phone so I wouldn't be able to make phone calls or call police. When Justin McClarin would find me on the street he would always take me back. He would not let me leave the house. He would lock me in the room because he thought no one knew where I was. He also would threaten to kill me (A1040).

## B. The parties' otherwise competing accounts at trial

Beyond this, the parties offered conflicting accounts. For their part, the officers testified that Miranda's aunt went with the officers by car and pointed them to the basement unit at 393 Warwick Street where she said McClarin was then holding Miranda against her will (A1325), and that they drove her home before returning to Warwick Street (A1334).

Officers Grieco and Sergeant Martinez testified that Officer Grieco knocked on the basement door and either Miranda or McClarin opened it (A1703, 1838). Sergeant Martinez testified that he heard McClarin telling Miranda repeatedly and "aggressively" to "close the door" and "don't let them in" (A1703). Officer Grieco testified that once he saw the injuries and bruises on Miranda's face he immediately removed McClarin

from the apartment (A1838-39, 1851), and Sergeant Martinez testified that he saw that Miranda was "all beat up and injured" (A1730).

Officer Ardolino testified that they found Miranda "distraught" and that she immediately confirmed that McClarin had been keeping her there against her will, describing her captivity and abuse in detail and confirming the prior third-party reports (A1563-64; *see* A1777-78). The officers testified that the "condition of the [basement] was extremely poor," with "garbage on the floor, clothes thrown about the room," and drugs, a scale, and bullets out in the main room (A1555).

The officers maintained that they repeatedly offered medical treatment to Miranda, but that she declined it (A1441-42). She then voluntarily accompanied them to the precinct and agreed to give the sworn statement (A1449, 1568). The officers' testimony that she rolled up her sleeves to show them the extent of her bruising (A1568) is corroborated by photographs of her arms and back (A1383-84).

As for the unrelated arrest of two men a few doors down earlier that night, Officer Schumacher testified that while walking to 393 Warwick Street from his car to assist with the investigation of the report about Miranda, he saw a man sitting in a car with the door open, an obvious

9

open container of alcohol "sitting on top of the car," and another man standing nearby (A1625-26). When the man in the car stood up, Schumacher noticed a bullet on the car floor, and after a consented-to search of the car, found a gun in the trunk (A1626). The officers immediately arrested the men, and secured the gun and car by bringing them to the precinct, and then returned to the scene soon after (A1332, 1627-28, 1658).

McClarin and Miranda gave a starkly different account at trial. McClarin, who testified first, claimed that neither he nor Miranda let the officers into the apartment, and the officers kicked open the door, brandishing guns and threatening to shoot (A1168-69; *see* A1356). Miranda, who testified later, claimed that one officer told her to "stop lying" and asked her where "the gun" was when she said she lived there and was not McClarin's hostage (A1358-59). They both testified that the officers "destroyed" the apartment, breaking the furniture and punching holes in the walls before speaking to Miranda (A1208, 1356). McClarin testified that the officers told him "we've been looking for you for a long time" (A1172). Miranda recanted her sworn statement from the night of McClarin's arrest, stating that when she arrived at the precinct, the

10

officers forced her to fabricate her statement under "threat" that she would "go[] to jail" if she did not do so (A1367, 1385). She claimed she "couldn't even leave" but did not identify the basis for her belief (A1366). And she testified that an officer told her what to write, but instructed her to do so in her own words, and told her the faster she wrote the statement the faster she could go home (A1365).

Contradicting her sworn statement, Miranda testified that she had a black eye that night not because McClarin beat her but because earlier that evening she had run into "a guy who was just using me basically for drugs" on the way back from the grocery store and he had punched her in the face (A1351, 1383). She stated that afterwards, she "ran straight to [her] aunt's house" but refused to tell her who had punched her, and left with McClarin soon after (A1352-54). When asked about photos of other injuries on her arms and back at trial, she said "I don't even remember what injury that was" (A1385). McClarin testified that when he texted Miranda's aunt "ain't nooooo telling" if he would beat Miranda, that he was "trying to be funny" (A1140).

As for the cups of pee and trays of dirty water shown in the officers' photographs, Miranda asserted that she voluntarily "pee[d] in cups

11

because there was no bathroom" in the unit and she didn't want to bother the upstairs neighbors, contradicting her written statement (A1350). McClarin said Miranda peed in jugs and bathed in dirty water in the boiler room voluntarily because she was too "lazy" to go upstairs and "just rough around the edges like that" (A1130-31).

McClarin also insisted that the drugs and bullets the officers attributed to him were not his (A1196). His account for how they ended up in his apartment rested entirely on his theory at summations that Miranda's aunt "never got in the[] police car" to identify his location (A1982). Instead, he claimed the officers saw the two men with an open container outside of 399 Warwick Street and then "stormed into 399 Warwick" with "no warrant" (A1985) because "[t]hey needed leverage over [McClarin's neighbor] to extract information about where Justin and Samantha were staying" (A1984). McClarin suggested that the officers then took the two men arrested that night to the precinct "to pressure" them, and "made a deal" with McClarin's neighbor to reveal McClarin and Miranda's location so that the officers could "place the drugs and bullets" there to frame McClarin (A1986, 1988; *see also* A1180-87, 1207).

One of the two men arrested, a friend of McClarin's, testified and claimed that he saw the officers enter 399 Warwick Street and take credit cards and drugs from it (A1280, 1287-88). He testified that the officers searched his car "two or three times" only after they finished searching 399 Warwick Street, and he suggested that they must have planted the gun in his truck as well (A1291, 1298).

## C. The district court's exclusion of audio recordings capturing McClarin promising Miranda hundreds of thousands of dollars to testify at trial

McClarin was the first witness at trial. During his cross-examination, he repeatedly denied offering Miranda money to testify, and specifically denied telling her that he would give her a share of his trial winnings to testify (A1214-15). To impeach his testimony on that point, the officers sought to introduce three audio recordings—discovered within one to two weeks before trial, after the parties' exhibit lists had been submitted—of phone calls in which McClarin promised to pay Miranda as much as $300,000 to testify (A1216-17).

The recordings were made at Rikers Island, where McClarin was in custody on charges unrelated to the incident in question. Specifically, the three recordings revealed that before trial, contrary to his testimony,

McClarin told Miranda (1) "just go along with it, and whatever we get ... you gonna get 300 .... that should be like 300k ... keep that in mind"; (2) that "whatever we get from [the trial]" she would have, but that she would "have to do the trial thing"; and (3) "Like I said, if you don't do it then this shit is over ... I'd rather you get that than leave you out there with nothing" (A1046-50).

After listening to the recordings, the court recognized that "there is no question it is cross-examination material" and that it did not "see any real prejudice" to McClarin from allowing it (A1271). Though the court's own rules did not require advance disclosure of impeachment evidence, in the court's view, the question was "whether or not" the evidence should be allowed "under the circumstances where in fairness to plaintiff, it wasn't disclosed prior" (A1267) and "came as a surprise" (A1271).

Rather than weigh those considerations, the court decided it would "leave it up to" plaintiff's counsel to decide whether the evidence should be allowed (A1271). The court told plaintiff's counsel directly that it would "leave the choice up to you," and offered him the choice to "leave it out or you can let it come in" (*id.*). The court then excluded the three recordings over the officers' objection, telling McClarin's counsel that it

14

would "honor [his] request and ... keep it out" (A1272). Noting that the ruling may be cause for appeal, the court later suggested to McClarin's counsel "you may want to reconsider" (A1433).

After the court excluded the recordings, McClarin testified that he told Miranda he would "possibly" give her a portion of the award (A1228). But he said he did not promise her money to lie at trial and "didn't tell her that she would be left with nothing" (A1228-29).

Miranda testified after the recordings had been excluded. In a response to questions from McClarin's counsel, she denied that McClarin "made any promises to" her that she would get rich if she testified (A1375, 1389). She also testified that McClarin, who was the father of her child, said "[s]omething, like, about, like, if you go and like, we win ... you and my son would be okay" (A1389). At that point, defendants revisited the admissibility of the recordings, arguing that McClarin's counsel had opened the door to their admission (A1379). The court again declined to allow them in while permitting McClarin's counsel to continue his line of questioning (*id.*).

15

### D. The district court's jury instructions, the verdict, and the officers' post-trial motion

After receiving draft jury instructions from the court, both parties submitted letters requesting that it revise the malicious prosecution instruction (A747, 753-55). The officers noted, on the question of causation, that the instruction "should read ... that the plaintiff suffered a post-arraignment loss of liberty *as a result*'" of the improper prosecution (A754 (emphasis added)).

Both parties proposed—albeit for different reasons—that the court instruct the jury to determine whether there was probable cause for *each* offense. McClarin asked the court to instruct the jury that he had to prove that "there was no probable cause to prosecute the plaintiff *for each crime charged*," and that "there was no probable cause to believe that [he] committed *each of* those crimes" (A747).

The officers agreed with that proposed modification and asked the court to instruct the jury that McClarin had to prove that the officers "lacked probable cause to believe that he committed *each* of the crimes I just defined to for you" (A755). The officers additionally asked the court to instruct the jury to identify the charges for which they found a lack of probable cause, explaining that if the jury found probable cause for a

16

subset of charges, McClarin might not be able to show that the officers'
allegedly wrongful conduct caused the underlying seizure (*id.*).

The officers raised these objections again at a charge conference the
next day. First, the officers informed the court, concerning the causation
question, that "according to the Second Circuit," McClarin had to show
that he "suffered a post-arraignment loss of liberty *as a result*" of
wrongful prosecution (A1936) (emphasis added), later repeating that the
instruction must include the phrase "as a result" (*id.*). Second, noting
that McClarin's five-day detention resulted from his failure to pay bail,
the officers urged the court to instruct the jury that McClarin had the
burden of showing a lack of probable cause for *each* of the underlying
felony charges (A1930-31, 1945). And third, they requested that the court
at least ask the jury to identify the charges that lacked probable cause,
noting that otherwise it would not be clear whether the jury erred in
imposing liability (A1932).

After instructing the jury on McClarin's burden of proof, the district
court turned to the elements of each of McClarin's claims against the
officers. The court initially instructed that McClarin must show he
suffered a loss of liberty "as a result" (A769), but later told the jury that

17

McClarin just had to show that "he suffered a loss of liberty after his arraignment," dropping "as a result" (A773). Though the officers agreed only that McClarin's five-day detention constituted a deprivation of liberty (A1936-37), the court stated that "[i]t is undisputed that Mr. McClarin was detained for five days *as a result of the charges against him*" (A773 (emphasis added)). And contrary to both parties' requests, the court instructed the jury that McClarin "must prove by a preponderance of the evidence that [the officers] lacked probable cause to believe that he committed *any* of the crimes [just defined]" (A773) (emphasis added).

The jury returned a unanimous verdict (A785-88). It found McClarin had not met his burden on his excessive force claim (A786) and related assault and battery claim (A788). But it found in McClarin's favor on the unlawful entry claim against Ardolino, Grieco, and Martinez (A785); the malicious prosecution claim against Ardolino and Grieco (A786-77); and failure to intervene claims against Martinez and Schumacher (A787). The jury awarded $115,000 in compensatory damages and $775,000 in punitive damages—totaling $890,000 (A787).

18

After the verdict, the officers again requested that the court ask the jury to identify which criminal charges they found were unsupported by probable cause (A2129). The court again rejected the request (*id.*).

The officers then moved for judgment as a matter of law under Rule 50, for a new trial under Rule 59 based on several of the district court's errors during trial (A790-91). McClarin opposed the officers' motion, and also moved to reinstate his *Monell* claim against the City.

The district court denied the parties' post-trial motions. As relevant here, first, the court found exigent circumstances did not justify the officers' entry into McClarin's apartment because the officers had stopped to make an unrelated arrest after receiving reports that Miranda was in danger, concluding that "the time spent on these activities would have allowed ample time to obtain a warrant" (SPA4-5).

Second, the court denied the defendants' motion for a new trial, reasoning, in relevant part, that it properly excluded the recorded phone calls to prevent unfair surprise during trial and that in any event, Miranda's testimony about those calls and other evidence about her relationship with McClarin "allowed the jury to make a fair assessment of Miranda's credibility" (SPA13-18). The court also held that that its

19

malicious prosecution instruction—in listing only felony offenses and omitting misdemeanors—was lawful under *Posr v. Doherty*, 944 F.2d 91 (2d Cir. 1991) (SPA10). The court did not address the officers' other contentions. The officers appealed from the final judgment, and McClarin did not cross appeal.

## SUMMARY OF ARGUMENT
## AND STANDARDS OF REVIEW

The district court erred first by leaving issues to the jury that should have been resolved as a matter of law, and second by compromising the jury's ability to assess the credibility of key witness and determine the officers' liability. As an initial matter, the officers were entitled to judgment as a matter of law on McClarin's unlawful entry claim, an issue this court reviews de novo. *Cash v. Cnty. of Erie*, 654 F.3d 324, 332-33 (2d Cir. 2011).

Though many of the facts at trial were disputed, the core facts leading up to the officers' entry into McClarin's apartment were not: the NYPD received reports that a woman was being held against her will on Warwick Street, Miranda's aunt corroborated those reports and informed officers that McClarin was physically abusing and drugging Miranda, and Miranda's aunt showed the officers menacing text messages from

20

McClarin that were consistent with that account. That information provided probable cause, or arguable probable cause, to believe that Miranda was in danger or in threat of serious injury—all that is needed to enter judgment for the officers on the unlawful entry claim.

In any event, the district court's errors during trial—excluding crucial evidence and giving a flawed jury instruction—require a new trial on the unlawful entry and malicious prosecution claims. This Court reviews evidentiary rulings for abuse of discretion, *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 136 (2d Cir. 2008), and jury instructions de novo. *Velez v. City of N.Y.*, 730 F.3d 128, 134 (2d Cir. 2013).

First, the court abused its discretion by baselessly excluding crucial impeachment evidence: recordings of phone calls between McClarin in Miranda in which he said he would give her hundreds of thousands of dollars to testify. The court's decision to exclude the evidence to "avoid surprise" lacked a sound legal basis—no rule required earlier disclosure of the impeachment evidence, and the court acknowledged that admitting it would not prejudice McClarin.

The error was far from harmless—the excluded evidence directly contradicted both McClarin and Miranda's testimony that McClarin

21

never paid Miranda to testify and undermined testimony from Miranda without which McClarin would have no case. The officers' account—that they responded to reports that a woman was being held against her will, that they found Miranda badly bruised, and that she told them she had been kept against her will and forced to pee in cups and bathe in dirty water—was corroborated by pictures of the apartment and Miranda's bruised body, as well as her sworn statement. By contrast, McClarin's version relied heavily on Miranda's trial testimony disavowing her earlier statement, claiming that her face was bruised because she had been punched by someone else she happened to run into earlier that day, and stating that the officers forced their way into the basement and coerced her into fabricating the sworn statement. As the district court put it, McClarin's entire case largely "depend[ed] upon [the jury's] believing Miranda's testimony that she got punched in the face by some guy ... and that she was forced to write all of those statements" (A686). Yet the court excluded vital impeachment evidence that struck at the heart of that testimony.

The officers are also entitled to a new trial on the malicious prosecution claim for the independent reason that the district court made

a series of errors in putting the claim to the jury. Specifically, the district court instructed the jury that there was no question that McClarin suffered a deprivation of liberty as a result of the five charges against him when it was the officers' position that fewer than five charges could have supported McClarin's five-day detention. At the same time, the district court instructed the jury that McClarin "must prove by a preponderance of the evidence that [the officers] lacked probable cause to believe that he committed *any* of the crimes I just defined for you" (A773) (emphasis added), without instructing it to identify the charges that it believed lacked probable cause—ensuring that it would be impossible for this Court to evaluate on appeal whether the elements of malicious prosecution were met.

## ARGUMENT

## POINT I

## THE OFFICERS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON McCLARIN'S UNLAWFUL ENTRY CLAIM

At trial, the sole question on McClarin's unlawful entry claim was whether exigent circumstances permitted Ardolino, Grieco, and Martinez to enter the apartment without a warrant (A2068-69). The officers are entitled to judgment as a matter of law on this claim because (1) the only

23

conclusion available on this record is that exigent circumstances were present, and (2) at minimum, the officers are entitled to qualified immunity, as no clearly established law would have compelled every reasonable officer to conclude the entry would be unconstitutional.

Exigent circumstances exist when, at the time of entry, there is probable cause to believe there is an "urgent need to render aid or take action," *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008) (cleaned up), like when a person may be "seriously injured or threatened with such injury," *Chamberlain v. City of White Plains*, 960 F.3d 100, 105 (2d Cir. 2020) (cleaned up).[2] Officers have especially "great latitude" when it comes to domestic disputes; all that is required is a "substantial reason to believe that one of the parties to the dispute was in danger." *Tierney v. Davidson*, 133 F.3d 189, 179 (2d Cir. 1998). The inquiry is "an objective one," *Klump*, 536 F.3d at 117-18, and "does not depend on the officers' subjective intent," *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam).

---

[2] This brief uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations.

Considered objectively, there was clearly probable cause to believe that Miranda was in danger or threatened with serious injury. 911 reports indicated that a woman, later revealed to be Miranda, was then being held against her will and assaulted (A1322, 1469-70). Miranda's aunt, subsequently confirmed to officers—once by phone and again in person—that Miranda was being held against her will, beaten, and drugged by McClarin (A1323-25), and she showed officers menacing text messages from McClarin consistent with that account (A1034-35). As McClarin's own counsel once asked, "If that doesn't constitute an emergency, then what does" (A1983)?

To be sure, some of the officers testified that they personally believed that the situation was serious, but not urgent, until they arrived on the scene and saw Miranda's condition (*see, e.g.*, A1692, 1786, 1835). But the inquiry is an objective one and is therefore not controlled by an officer's subjective beliefs or priorities. *Michigan*, 558 U.S. at 47.

The officers' personal beliefs align with their broader testimony that they never made a "no-knock" entry, and instead knocked and, when the door was opened, observed a bruised and beaten Miranda (A1702-03, 1775-76, 1838-39, 1851). But even crediting McClarin's claim that the

25

officers simply broke down the door, the key point is that exigent circumstances are assessed objectively. The officers' subjective beliefs do not negate the undisputed facts establishing that there was substantial reason to believe that Miranda was in danger or threatened with serious injury.

The district court faulted the officers for taking the time—at most, a couple of hours—to make a pair of unrelated arrests involving a firearm in a car (SPA4-5, A1548). But there is no question that the officers had probable cause to believe that Miranda was in danger or threatened with serious injury after they received the 911 report and spoke with Miranda's aunt, and there is no credible argument that probable cause somehow dissipated by the time officers arrived on the scene. The district court opined that the officers could have obtained a warrant in the time that they carried out the unrelated arrests, but that is beside the point. The question is whether the exigency standard was satisfied—and it was.

Nor does it matter that the officers' weighing of priorities may have been flawed. The question is not whether the officers should have acted sooner, but rather whether the objective circumstances indicated exigency at the time that they did act. And, again, the inquiry is a purely

objective one: whether the officers subjectively believed that their response could wait is not determinative. What matters is that the undisputed facts establish exigent circumstances through the time of entry.

At most, the notion that the officers may have made "reasonable but mistaken judgments" when balancing competing public safety concerns is only a basis to find that they are entitled to qualified immunity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The district court, however, never performed a proper qualified immunity analysis, believing that the question was resolved by the verdict (SPA5), even though qualified immunity is a "question of law" for the reviewing court because it is about "the law as it existed at the time of the particular incident." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (cleaned up).[3] The failure is particularly perplexing considering that the court had concluded at the summary judgment stage—in a ruling left unchallenged

---

[3] The district court also refused to provide the jury with special interrogatories to facilitate the qualified immunity analysis (A1879-80, 2129). While that, too, was error, the officers' entitlement to qualified immunity is nonetheless clear on this record.

27

by McClarin—that the officers were entitled to qualified immunity for arresting McClarin, based on similar circumstances (A665-67).

McClarin, for his part, has never pointed to any clearly established law—from the Supreme Court or this Court—at the time of the encounter in 2015 that would have compelled every reasonable officer to conclude that any warrantless entry had to be at some unspecified point before the officers actually entered the apartment. The hazy border between a permissible warrantless entry and an impermissible one—based on the passage of a short amount of time, with competing public safety concerns in play—warrants qualified immunity. *See Batt v. Buccilli*, 725 F. App'x 23, 28 (2d Cir. 2018) (holding officers entitled to qualified immunity for warrantless entry when responding to tip from family member).

## POINT II

### THE OFFICERS ARE ENTITLED TO A NEW TRIAL IN ANY EVENT

Even assuming the officers are not entitled to judgment as a matter of law on McClarin's unlawful entry claim, a new trial is required on that claim as well as the malicious prosecution claim. On both fronts, the district court erred in withholding from the jury's consideration compelling impeachment evidence going to the heart of McClarin's

28

account, his credibility, and the credibility of his main witness. Separately, the district court's multiple errors in putting the malicious prosecution claim to the jury supports a new trial on that claim.

## A. The district court erred in excluding compelling, recently discovered impeachment evidence going to the heart of McClarin's case.

On the second day of trial, during McClarin's cross-examination on his case in chief, the officers sought to introduce three recordings of phone conversations between McClarin and Miranda while the former was being detained at Rikers Island for unrelated reasons. Those recordings were damning impeachment evidence—had they been admitted, they easily could have been the most important evidence in the jurors' eyes. As McClarin's own counsel put it, this evidence went "to the heart of the case" (A1223), leaving no doubt that McClarin had falsely testified about half a dozen times that he never offered money to Miranda to testify, and more broadly, sharply undermining McClarin's credibility. Had the court allowed it in, this evidence also would have directly impeached Miranda's later testimony denying that McClarin ever promised her money to testify and called into question her motive for testifying (A1389). This is

29

impeachment evidence of the highest order, and the district court erred in withholding it from the jury for three reasons.

*First*, while district courts certainly have discretion in navigating evidentiary matters at trial, they must exercise their discretion. The district court failed to do so here, and instead abdicated its responsibilities to McClarin's counsel. Notwithstanding the court's attempt to own the outcome in a post-trial memorandum (SPA13-18), at trial the court unequivocally told McClarin's counsel that it would "leave the choice up to [him]" (A1271). When McClarin's counsel unsurprisingly opted for exclusion, the court responded that it would "honor [his] request and … keep [the recordings] out" (A1272; *see also* A1433 (suggesting McClarin's counsel may want to "reconsider" his decision)).

*Second*, even setting that to one side, the only explanation ever provided for excluding the recordings—that they supposedly should have been included in pretrial disclosures—rests on a false premise.[4] As even

_____

[4] After trial, but not during, McClarin argued that the recordings were also subject to a sweeping document request (EDNY ECF No. 147 at 34). The district court never adopted the point, perhaps because McClarin failed to acknowledge that the officers had objected to the document request on multiple grounds years before trial and he had never pressed the issue in a motion to compel or through other means (EDNY ECF No. 150 at 12-13). *See United States v. Figueroa*, 548 F.3d 222, 230 (2d Cir. 2008) (declining to consider arguments for exclusion not considered by district court).

the district court recognized (A1271), the recordings were classic impeachment evidence, initially offered in response to a series of false statements McClarin made on the stand denying that he offered Miranda a share of the jury award to testify at trial, and which likewise contradicted Miranda's false testimony on the same point.

Even assuming the recordings were in the officers' possession when the parties made their pretrial disclosures (they were not), the officers were not required to identify them. Federal Rule of Civil Procedure 26(a)(3)(A) specifically excludes from the pretrial disclosure requirement any evidence that would be used "solely for impeachment." And the trial judge's individual rules of practice only required each party to submit a "list … of exhibits to be offered in its case in chief."[5] Where no express rule warned the parties that impeachment evidence would be excluded if identified before trial, there was no basis to withhold the recordings from the jury by imposing such a requirement after the fact. *See, e.g., Ling-*

---

[5] Senior Judge Frederic Block, Individual Motion Practices and Rules ⁋ 3(A)(x)(2) https://perma.cc/Q99S-M7QH. To be sure, the final sentence of that paragraph stated that "[o]nly exhibits listed will be received in evidence except for good cause shown," but the reference to "exhibits listed" there obviously harkens back to the preceding requirement that each party list the exhibits to be presented on its case in chief. Any other reading would deprive the "case in chief" limitation of meaning.

*Rong Chen v. City of Syracuse*, 385 F. App'x 41, 42 (2d Cir. 2010) (previously undisclosed witness could testify to impeach plaintiff's testimony, particularly where plaintiff did not make the disputed statements until trial); *Deitrick v. Costa*, 849 F. App'x 370, 371 (3d Cir. 2021) (previously undisclosed recordings admissible to impeach plaintiff's testimony at trial); *Calhoun v. Walmart Stores E., LP*, 818 F. App'x 899, 905 (11th Cir. 2020) (previously undisclosed social media posts admissible to impeach plaintiff's testimony at trial).

*Third*, even setting all that to the side, and assuming the officers were required to identify the recordings in their pretrial disclosures, the district court still erred in excluding them. Exclusion is not an automatic remedy. Instead, this Court considers four factors when evaluating a trial court's decision to exclude evidence for belated disclosure: (1) the importance of the evidence; (2) the possibility of prejudice to the other side; (3) the explanation for the late disclosure; and (4) the possibility of a continuance. *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006). Here, two of these three factors weighed heavily in favor of admitting the recordings at trial, and the other two are at worst neutral.

On the first factor, the recordings were of profound significance. To be clear, McClarin's testimony did not just give an inaccurate impression of his conversations with Miranda; he flatly denied that he ever said many serious statements memorialized in the recordings. And he did so not just once, but at least six separate times.[6] The recordings would have dramatically undercut McClarin's entire credibility. And it would have had a similar effect as to Miranda, who was also allowed to give the jury an inaccurate impression of the conversation. The recordings therefore would have both impeached her inconsistent testimony and demonstrated that she had a substantial financial incentive to testify in McClarin's favor, providing probative evidence that the two conspired to provide false testimony at trial.

As the district court recognized, credibility was "[a] big part of the case here" (A2063), and "everything depend[ed] on the [jury's] believing Miranda's testimony that she got punched in the face by some guy ... and that she was forced to write all of those statements" (A1747). At the end

---

[6] *See, e.g.*, A1214-15 (answering "no" when asked "Did you offer [Miranda] money to testify at this trial?"; if he "told [Miranda] if you win at this trial, you will give her everything she wins, but that she has to testify?"; and "Did you say that to her or not?"); A1229 ("I didn't tell her that she would be left with nothing.").

of the day, we could not put it better than McClarin's counsel did: the recordings went "to the heart of the case" (A1223). Indeed, the recordings' importance weighed so decisively in favor of admission that it was likely reason enough to require them to be put before the jury.

But there was also no prejudice to McClarin—the second factor. The district court certainly did not see "any real prejudice here" (A1271). After all, McClarin was obviously a party to the recorded conversations, and the notion that he may not have been candid with his own counsel about them is not something that can be laid at the officers' feet. *See Scruggs v. United States*, No. 95-5317, 1995 U.S. App. LEXIS 24664, at *5 (6th Cir. Aug. 10, 1995) (noting plaintiff "was not unfairly surprised by the introduction of the tapes, as he clearly knew the content of his own telephone conversations"). The conversations were also straightforward. As the district court observed, it would have made little difference if counsel heard them a week or two earlier (A1224), and McClarin would have an opportunity to address them on the stand (A1269), including a chance to "explain or deny" the statements. Fed. R. Evid. 613(b).

Under these circumstances, the most McClarin would have been entitled to was a brief adjournment and some latitude on redirect. But

34

McClarin did not request anything short of exclusion, perhaps because the district court made it clear it would leave the decision up to him, and exclusion was key for him to win the case. *See Outley v. New York*, 837 F.2d 587, 590 (2d Cir. 1988) (noting that courts must "consider less drastic responses" before imposing "the extreme sanction of preclusion"). In any event, the absence of prejudice—like the evidence's importance—weighed heavily in favor of allowing the jury to consider the recordings.

The third factor—the explanation for the timing of the disclosure—also weighs in favor of disclosure or, at the worst, is neutral. For the reasons explained above, the officers at minimum had a "good faith" basis to believe that the recordings need not have been identified in their pretrial disclosures. *Id.* And the time between the officers' discovery of the recordings and their disclosure was at most one to two weeks, with disclosure occurring early during the trial. This is not the sort of "extreme misconduct" that may sometimes justify excluding "extremely important" evidence. *Id.* at 591.

The exclusion of the recordings requires a new trial on the unlawful entry claim—if that claim survives judgment as a matter of law—as well as the malicious prosecution claim. In a case that was in no small part

about credibility, the recordings had the potential to eviscerate McClarin's credibility, sharply undercut Miranda's credibility, and fundamentally shift the jury's assessment of the parties' competing accounts on everything from the facts surrounding the officers' entry into the apartment to the veracity of Miranda's contemporaneous statement confirming that McClarin had held her against her will and beaten her. McClarin's case was hardly overwhelming: as the district court observed, the jury "may believe" that Miranda was assaulted by someone she encountered by happenstance on the street and that she was forced to handwrite a statement implicating McClarin after his arrest, but they "may believe there's a Santa Claus also" (A1747).

McClarin may argue on appeal that admitting the recordings was unnecessary considering other evidence at trial. *See United States v. Stewart*, 907 F.3d 677, 690 (2d Cir. 2018) (finding testimony lacked crucial details and could not substitute for excluded impeachment evidence). But the district court actually made matters worse by allowing McClarin and Miranda to portray their conversations in a softer light without admitting the recordings themselves. *See United States v. Rosa*,

11 F.3d 315, 335 (2d Cir. 1993) (observing that parties may open door to evidence when testimony gives "false impression").

After making a series of statements that were flatly contradicted by the recordings, McClarin merely stated that he "possibly" said he would give a portion of an award to Miranda (A1228). And after Miranda denied that anyone promised her money to testify (A1375), she claimed that McClarin only told her that she and her son would "be okay" if he won the case, and did so to alleviate her anxiety about testifying (A1389). This self-serving testimony is a far cry from McClarin's statements on the recording that if Miranda would "go along with it"—namely, "the trial thing"— she would get "like 300k," but that if she did not "then this shit is over" and she would get nothing (A1046-50). The officers were entitled to put the recordings before the jurors and allow them to make their own assessments of the parties' motivations and credibility, rather than having them hear only a filtered and plaintiff-friendly version.

## B. A series of overlapping errors on McClarin's malicious prosecution claim provide a separate basis for a new trial on that claim.

The district court also committed a constellation of errors when putting McClarin's Fourth Amendment malicious prosecution claim to

the jury. Any one of those errors—in isolation—might not have been reversible error. But together, they deprived the officers of a fair trial.

The core problem is this. At trial, it was the officers' position that probable cause for any *one* of the serious felonies with which McClarin was charged would have justified his relatively brief five-day detention. But the jury was not asked to weigh in on that question. And with the way the instructions and verdict were structured, it is anyone's guess whether the jury found there was probable cause for one or more of the felonies, preventing a reviewing court from determining whether the officers are entitled to judgment as a matter of law on this question.[7]

At trial, the officers proposed three different ways that this problem could have been avoided. The district court rejected them all.

---

[7] This Court routinely considers whether the lack of probable cause on a single charge is sufficient to support a malicious prosecution claim where there were other valid—and potentially more serious—charges at play. *See, e.g.*, *Coleman v. City of N.Y.*, 688 F. App'x 56 (2d Cir. 2017) (dismissing malicious prosecution claim where deprivation of liberty was attributable to other criminal charges aside from one assault charge lacking probable cause); *Hoyos v. City of N.Y.*, 650 F. App'x 801 (2d Cir. 2016) (evidence supporting probable cause to prosecute was sufficiently strong that any allegedly fabricated evidence did not proximately cause deprivation of liberty); *Walker v. Sankhi*, 494 F. App'x 140, 143 (2d Cir. 2012) (deprivation of liberty element not met where plaintiff was already in custody for a separate charge).

38

## 1. The district court failed to provide a proper causation instruction to the jury.

The first way the district court could have avoided the problem was by providing a proper instruction on the question of causation. When instructing the jury, the court initially told the jury that McClarin had to prove that he "suffered a post-arraignment loss of liberty as a result" of a malicious initiation of the prosecution without probable cause (A2072). But in unpacking this element, the district court removed the causation question from the jury's consideration, telling the jury that McClarin only had to prove "that he suffered a loss of liberty after his arraignment" (A2077). Not only did the court drop the "as a result" language that is the core of the causation inquiry, it told the jury that the question was already resolved, indicating that "McClarin was detained for five days *as a result of the charges against him*" (A2077 (emphasis added).

The upshot was that the jury was never tasked with determining whether McClarin's five-day detention was *caused* by his being charged one or more crimes unsupported probable cause. It did not have to be this way. While the officers agreed that the jury did not need to determine whether McClarin had experienced a loss of liberty (A1936-37), they consistently maintained that the jury had to weigh in on whether that

39

loss of liberty was caused by the officers' wrongful conduct.[8] To be sure, the jury may not have agreed with the officers' position that probable cause on any one of felonies would have independently justified the seizure, but the officers were entitled to have the jury decide that question. *See Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010) (noting jury instruction erroneous "if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law") (cleaned up).

### 2. The district court failed to provide a probable cause charge appropriately tailored to the case.

The second way the district court could have avoided the problem was by providing an instruction on the probable cause element that would have achieved the same end under the circumstances of this case. Both sides urged the court to instruct the jury to determine whether probable cause was lacking for "each" of the felonies (A747, 755). In other

---

[8] *See* A753 ("The fifth element should read, '(5)' that the plaintiff suffered *a post-arraignment* loss *of* liberty *as a result*.") (emphasis reflecting proposed changes to jury instructions); A755 (substantially the same); A1936 ("[T]he element, according to [the] Second Circuit, is actually '… that the Plaintiff suffered a post-arraignment loss of liberty as a result….'"); *id.* ("And then 'loss of liberty as a result.'").

words, the parties proposed to instruct the jury that if it found there was probable cause for just *one* felony, it should return a defense verdict.[9]

While such a charge might not be appropriate in every malicious prosecution case, it would have been tailored to the circumstances of this case—and provided another path for the jury to resolve the causation question.[10] On the one hand, McClarin's detention was a mere five days; on the other hand, he was charged with several serious felonies, any one of which would have justified his brief detention as a matter of law. With the combination of these two factors, it would have been entirely appropriate to task the jury with deciding whether probable cause was lacking for each and every felony—as both sides had requested.

---

[9] The officers also believed that probable cause on some combination of the misdemeanors with which McClarin was charged could lead to the same result. For the purpose of this appeal, we focus on the felonies.

[10] While not directly relevant to this case, we note that the Supreme Court recently granted certiorari on the question whether a Fourth Amendment malicious prosecution claim is defeated when there is probable cause as to any crime charged in the underlying action, or whether the plaintiff must show only that probable cause was lacking on one charge, provided that the charge in question caused the seizure. *See Chiaverini v. City of Napoleon*, No. 23-50, 2023 U.S. LEXIS 4915 (Dec. 13, 2023). There, the Sixth Circuit found that the existence of probable cause for lesser charges—a misdemeanor charge and a licensing violation—defeated plaintiff's malicious prosecution even though he was also charged with a felony count for which the court did not find probable cause. *See Chiaverini v. City of Napoleon*, No. 21-3996, 2023 U.S. App. LEXIS 865, at *10-11 (6th Cir. Jan. 11, 2023).

Instead, the district court instructed the jury to determine whether probable cause was lacking for "any" of the felonies (A773). By substituting "any" for "each," the district court ensured that the jury could have read the instruction in two different ways: that, to render a verdict for McClarin, probable cause had to be lacking for (a) *all* of the charges; or (b) just *one* of the charges. *See Mendoza v. Nordstrom, Inc.*, 778 F.3d 834, 840 (9th Cir. 2015) ("'any' can mean 'each' or 'all'"). An adjacent instruction, innocuous on its own, compounded the problem, with the court telling the jury that its focus should be on the "crimes"—plural—"that justified the five-day detention after his arraignment" (A771), reinforcing the impression that *all* of the charges were essential to justifying McClarin's detention (*see also* A1930 (the district court expressing the view that the jury should "focus[] on the ones"—again, plural—that "obviously cost [McClarin] his liberty")).

With this instruction and on this record, it is entirely possible that the jury found that probable cause was lacking for some of the charges, but not all of them. *See Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (noting that erroneous jury instruction requires new trial unless this Court "is convinced that the error did not influence the jury's

42

verdict"). After all, the charges did not have to rise and fall together. For example, the kidnapping and unlawful imprisonment charges rested in part on the foundation laid by a third party's reports to police that McClarin was holding Miranda against her will in a basement with no bathroom, forcing her to urinate in cups in a boiler room, and beating her. Meanwhile, the possession of controlled substances charge largely turned on competing testimony about whether the officers encountered drugs in McClarin's apartment or instead planted them there.

The error is far from harmless. McClarin was detained for five days after he was unable to make bail at arraignment, and he made no court appearances post-arraignment. Probable cause for any one of the serious felonies identified for the jury would have supported setting bail and the relatively brief post-arraignment detention. But the jury could have reasonably believed that district court's instruction required it to render a verdict for McClarin if probable cause was lacking for any one felony.

### 3. The district court erred in failing to ask the jury to specify the charges it found were unsupported by probable cause.

The third way the district court could have avoided the problem was by asking the jury to specify which charges they found were unsupported

43

by probable cause—as the officers had requested (A1816). The district court refused. We will therefore never "know which charge or charges the jury may have found to have lacked probable cause." *Posr*, 944 F.2d at 100; *see also id.* (highlighting the "need to separately analyze the charges claimed to have been maliciously prosecuted").

Had the district court made neither of the errors described above, it might not have been necessary to ask to the jury to specify the charges it found were unsupported by probable cause. But as things unfolded, it is impossible to "discern from the general verdict how the jury may have resolved" the question of whether there was probable cause for one or more of the felonies. *Jones v. Treubig*, 963 F.3d 214, 232-33 (2d Cir. 2020). And because the causation question was taken away from the jury, it is impossible to say whether the jury would have found that the absence of probable cause for one or more offenses was the cause of McClarin's detention. Against this backdrop, the district court should at the very least have asked the jury to specify which charges it found were unsupported by probable cause—to enable a reviewing court to evaluate an argument that probable cause for one or more of the felonies was sufficient to justify McClarin's detention as a matter of law, and that the

44

absence of probable cause for any charges did not cause an independent liberty deprivation.

*  *  *

Again, one of these errors might not have been fatal. But in combination, they require a new trial. The officers are entitled to have a jury determine whether McClarin's brief detention was caused by him being wrongfully charged with a crime. Alternatively, the district court could have taken up the officers' request to have the jury specify which charges it found were unsupported by probable cause, which at least would have allowed the district court—and this Court—to ascertain whether the jury applied the law correctly and imposed liability only where the officers' wrongful conduct caused the seizure.

## CONCLUSION

This Court should vacate the judgment and remand to the district court with instructions to enter judgment as a matter of law in the officers' favor on McClarin's unlawful entry claim and to hold a new trial on the malicious prosecution claim. In the alternative, the Court should vacate the judgment and direct a new trial on both claims.

Dated:  New York, NY
        January 18, 2024

                              Respectfully submitted,

                              HON. SYLVIA O. HINDS-RADIX
                              *Corporation Counsel*
                              *of the City of New York*
                              Attorney for Appellants

                         By:  _____
                              LAUREN L. O'BRIEN
                              Assistant Corporation Counsel

                              100 Church Street
                              New York, NY 10007
                              212-356-0852
                              lobrien@law.nyc.gov

RICHARD DEARING
DEVIN SLACK
LAUREN L. O'BRIEN
  *of Counsel*

46

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 9,565 words, not including the table of contents, table of authorities, this certificate, and the cover.

LAUREN L. O'BRIEN