# 23-7310-cv

## United States Court of Appeals
### *for the*
## Second Circuit

JUSTIN MCCLARIN,

*Plaintiff-Appellee,*

– v. –

THE CITY OF NEW YORK, POLICE DAVID GREICO,
POLICE OFFICER MICHAEL ARDOLINO, DAVID QUATTROCHI,
SGT. ROBERT MARTINEZ, WILLIAM SCHUMACHER,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE

MICHAEL HUESTON
16 Court Street, 35th Floor
Brooklyn, New York 11241
(718) 246-2900

RICHARD CARDINALE
26 Court Street, Suite 1504
Brooklyn, New York 11242
(718) 624-9391

EYLAN SCHULMAN
MOSKOWITZ COLSON GINSBERG
  & SCHULMAN LLP
80 Broad Street, Suite 1900
New York, New York 10004
(212) 257-6455

*Attorneys for Plaintiff-Appellee*


CP COUNSEL PRESS    (800) 4-APPEAL • (329071)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF THE CASE ............................................................. 4

    1.    Appellee's Version of Events ............................................. 4

    2.    Basis for the Jury's Verdict ............................................... 7

SUMMARY OF THE ARGUMENT ................................................... 17

ARGUMENT ....................................................................................... 17

    POINT I

    APPELLANTS ARE NOT ENTITLED TO JUDGMENT AS A
    MATTER OF LAW ON APPELLEE'S UNLAWFUL ENTRY
    CLAIM ............................................................................................ 17

    POINT II

    APPELLANTS ARE NOT ENTITLED TO A NEW TRIAL ON
    APPELLEE'S UNLAWFUL ENTRY OR MALICIOUS
    PROSECUTION CLAIM .............................................................. 27

    1.    The District Court Correctly Precluded Appellants'
        Impeachment Evidence ...................................................... 28

    2.    Appellants are Incorrect that "A Series Of Overlapping Errors
        On McClarin's Malicious Prosecution Claim Provide a
        Separate Basis for a New Trial on that Claim" ................................. 32

        A.    The District Court Did Not Fail to Provide a Proper
            Causation Instruction to the Jury ............................... 33

        B.    The District Court Did Not Fail to Provide a Probable
            Cause Charge Appropriately Tailored to the Case ................. 34

        C.    The District Court Did Not Err by Not Asking the Jury
            to Specify the Charges it Found Were Unsupported by
            Probable Cause ............................................................ 35

CONCLUSION ................................................................................... 38

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) ...................................................25

*Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*,
  425 F.3d 126 (2d Cir. 2005) ..........................................27

*Bakalor v. J.B. Hunt Transp., Inc.*,
  No. 11-CV-2911, 2013 U.S. Dist. LEXIS 88472, 2013 WL 3185546
  (S.D.N.Y. June 24, 2013) ...............................................18

*Bedasie v. Mr. Z Towing, Inc.*,
  No. 13-CV-5453 (CLP), 2016 U.S. Dist. LEXIS 57431
  (E.D.N.Y. Apr. 29, 2016) .......................................... 28-29

*Carroll v. Cty. of Monroe*,
  712 F.3d 649 (2d Cir. 2013) ...........................................27

*Cash v. Cty. of Erie*,
  654 F.3d 324 (2d Cir. 2011) ......................................18, 19

*Emamian v. Rockefeller Univ.*,
  823 F. App'x 40 (2d Cir. 2020) .....................................26

*Farrior v. Waterford Bd. of Educ.*,
  277 F.3d 633 (2d Cir. 2002) ..........................................27

*Ginns v. Towle*,
  361 F.2d 798 (2d Cir. 1966) ..........................................29

*Graham v. City of N.Y.*,
  128 F. Supp. 3d 681 (E.D.N.Y. 2015)...........................17, 19, 27

*ING Global v. United Parcel Serv. Oasis Supply Corp.*,
  757 F.3d 92 (2d Cir. 2014) ...........................................27

*Jones v. Town of E. Haven*,
  691 F.3d 72 (2d Cir. 2012) ...........................................18

*Jones v. Treubig*,
  963 F.3d 214 (2d Cir. 2020) ......................................22, 37

*Manley v. AmBase Corp.*,
    337 F.3d 237 (2d Cir. 2003) .........................................................................27

*Mawby v. United States*,
    999 F.2d 1252 (8th Cir. 1993) .....................................................................29

*Mickle v. Morin*,
    297 F.3d 114 (2d Cir. 2002) .........................................................................20

*Niagara Mohawk Power Corp. v.*
    *Hudson River-Black River Regulating Dist.*,
    673 F.3d 84 (2d Cir. 2012) ...........................................................................24

*Pappas v. Middle Earth Condo. Ass'n*,
    963 F.2d 534 (2d Cir. 1992) .........................................................................27

*Posr v. Doherty*,
    944 F.2d 91 (2d Cir. 1991) .....................................................................35, 36

*Raedle v. Credit Agricole Indosuez*,
    670 F.3d 411 (2d Cir. 2012) .........................................................................27

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ...........................18

*Rivera v. United States*,
    928 F.2d 592 (2d Cir. 1991) ....................................................................22, 24

*Stampf v. Long Island R.R. Co.*,
    761 F.3d 192 (2d. Cir. 2014) ........................................................................27

*Stephenson v. Doe*,
    332 F.3d 68 (2d Cir. 2003) ...........................................................................35

*Tolbert v. Queens Coll.*,
    242 F.3d 58 (2d Cir. 2001) ...........................................................................25

*Tracy v. Freshwater*,
    623 F.3d 90 (2d Cir. 2010) ...........................................................................21

*United States v. Botti*,
    711 F.3d 299 (2d Cir. 2013) .........................................................................25

*United States v. Kozeny*,
    667 F.3d 122 (2d Cir. 2011) .........................................................................27

*Vijayanagar v. Krishna*,
   No. 3:18-CV-00553 (KAD), 2021 U.S. Dist. LEXIS 158608
   (D. Conn. Aug. 23, 2021) ...................................................................29

*Wiercinski v. Mangia 57, Inc.*,
   787 F.3d 106 (2d Cir. 2015) ............................................................18

*Zellner v. Summerlin*,
   494 F.3d 344 (2d Cir. 2007) .........................................................18, 26

**Statutes & Other Authorities:**

Fed. R. Civ. P. 26(b)(3)........................................................................30

Fed. R. Civ. P. 45(a)(4)........................................................................30

Fed. R. Civ. P. 50 ................................................................................18

Fed. R. Civ. P. 50(a)(1)........................................................................18

Fed. R. Civ. P. 50(b) ...........................................................................18

Fed. R. Civ. P. 59 ................................................................................27

Fed. R. Civ. P. 59(a)(1)(A) ..................................................................27

## PRELIMINARY STATEMENT

Appellee Justin McClarin submits this brief in opposition to appellants' appeal of the final judgment after trial, entered on September 11, 2023. The jury in this case: (1) found for appellants on appellee's excessive force and assault and battery claims; (2) found for appellee on his unlawful entry claim against appellants Officer Michael Ardolino, Officer William Schumacher, Field Intelligence Officer David Grieco, and Sergeant Robert Martinez, awarding $40,000 in compensatory damages, $75,000 in punitive damages against Grieco, $75,000 in punitive damages against Ardolino, and $125,000 in punitive damages against Martinez; and (3) found for appellee on his malicious prosecution claim against  Ardolino and Grieco and corresponding failure to intervene claims against Schumacher and Martinez, awarding $75,000 in compensatory damages, $150,000 in punitive damages against Ardolino, $150,000 in punitive damages against Grieco, $150,000 in punitive damages against Martinez, and $50,000 in punitive damages against Schumacher.

Appellants, as limited by their brief, argue that they are entitled to judgment as a matter of law on appellee's unlawful entry claim because the only conclusion available on this record is that exigent circumstances were present and justified any warrantless entry, and, in the alternative,  appellants are entitled to qualified immunity. Appellants' Brief at 1-2.

Second, appellants argue that they are entitled to a new trial on appellee's unlawful entry claim and his malicious prosecution claim because the district court erred in excluding impeachment evidence, specifically, recorded phone calls between appellee and appellee's girlfriend, Samantha Miranda, who testified at trial. *Id.* at 2. Third, appellants contend that the district court "made a series of interconnected errors" when charging the jury on appellee's malicious prosecution claim.

After the verdict, appellants moved for judgment as a matter of law under Rule 50 and for a new trial under Rule 59, which the district court denied in a Memorandum and Order, dated September 8, 2023. Appellants argue in their brief that "[th]e district court found that "exigent circumstances did not justify the officers' entry into McClarin's apartment because the appellants had stopped to make an unrelated arrest [of Desmonn Beckett and Anthony Modeste] after receiving reports that [Samantha] Miranda was in danger, concluding that 'the time spent on these activities would have allowed ample time to obtain a warrant.'" App. Br. at 19 (citing Order at 3-4). Second, appellants contend that the district court erred in denying their motion for a new trial, the court reasoning, in relevant part, that it properly excluded the recorded phone calls between appellee and Miranda to prevent unfair surprise during trial and that, in any event, Miranda's testimony about those calls, and

2

other evidence about her relationship with appellee, "'allowed the jury to make a fair assessment of Miranda's credibility.'" *Id.* at 19 (citing Order at 16-17).

Appellants have abandoned their argument that the district court's malicious prosecution instruction – in listing only the felony offenses filed against appellee by appellants and omitting the misdemeanors – was incorrect. *Id.* at 19-20 and footnote 9. However, appellants contend that the "flawed jury instruction" requires a new trial on the unlawful entry and malicious prosecution claims. *Id.* at 21-23.

As will be demonstrated below, appellants' arguments are meritless. First, by presenting only the appellants' version of events in their appeal, appellants have misapprehended the law, contending that the jury was required to believe appellants' testimony and evidence at trial, rather than appellee and his evidence. It is well settled law that appellants cannot properly ask this Court to adopt their version of events in deciding this appeal. Moreover, appellants have provided no case law or facts in this appeal which warrant judgment as a matter of law or a new trial. Thus, the verdict should be sustained.

## STATEMENT OF THE CASE

As the jury, by virtue of its verdict, clearly credited the evidence presented by appellee and his witnesses, including Samantha Miranda, appellee will set forth the facts in the record which provide a basis for the jury's verdict.

## 1. Appellee's Version of Events

As appellee's counsel stated in his opening statement, the appellants violated appellee's civil rights on December 13, 2015 by illegally entering the basement apartment he shared with his girlfriend and the mother of his child, Samantha Miranda, at 393 Warwick Street in Brooklyn; fabricating that illegal contraband was recovered in the residence; attempting to coerce Miranda to make false allegations against appellee, and presenting false allegations to prosecutors in an attempt to have appellee prosecuted on false charges, including serious felonies. (A-1092-93, 1095).

Appellee's counsel, in his opening statement, also told the jury that, on December 12, 2015, Miranda's ex-boyfriend, Sal Imperato, with whom she consumed illegal narcotics in the past, did not like that appellee was helping Miranda get off drugs and helping her, including by obtaining a small apartment for both her and appellee to reside. Imperato assaulted and battered Miranda on December 12, 2015, causing visible injuries to her face. (A-1096). After the attack, Miranda went to her aunt Marisol Lopez's home, which was

also in Brooklyn. (A-1097). Lopez questioned Miranda about what happened to her face, but Miranda did not wish to discuss it. Miranda called appellee using Lopez's telephone and asked him to come get her and take her to their apartment. (A-1097). Lopez used drugs herself and was not pleased with appellee helping Miranda. (A-1097).

Appellee and Miranda went to their apartment and later went to sleep. (A-1097). At approximately 3:00 a.m., appellants banged on the door, kicked it open, and entered the residence without a warrant. (A-1098). Appellants arrested appellee and ransacked the residence – including kicking holes in the walls and pulling doors off their hinges. Appellants showed no interest in Miranda's well-being, their purported reason for entering. (A-1098). Officer Ardolino told Miranda that her aunt reported to them that appellee had kidnapped her. Miranda told appellants that she was safe and that appellee was not holding her against her will. (A-1098). Officer Quattrocchi, Officer Schumacher, Sergeant Martinez, and Officer Grieco, who had also illegally entered the home, were present for Miranda's statement that she was safe and not being held against her will, and they participated in the destruction of the apartment and the false charges filed against appellee. (A-1099).

Finding nothing illegal in appellee's residence, appellants took contraband from a residence two doors away, and falsely stated that they had

found it at 393 Warwick Street so that appellee could be charged. (A-1100). Officer Ardolino and Field Intelligence Officer Grieco forced Miranda, under penalty of being arrested and charged, to write a false statement that appellee had kidnapped her and made her ingest drugs. (A-1101). Although Miranda was visibly injured because of the assault by Sal Imperato, the appellants did not call for an ambulance or secure medical treatment for her. (A-1102).

Appellee was charged with a litany of serious crimes, from possession of a controlled substance to kidnapping and false imprisonment. (A-1102). Appellee spent 5 or 6 days at Rikers Island Correctional Facility before being released a day after the Grand Jury declined to indict him. (A-1103-04). Officer Ardolino pressured Miranda to testify in the Grand Jury that appellee had kidnapped her, but Miranda, in a meeting with the Assistant District Attorney, told the prosecutor the truth – that appellants fabricated the allegations and forced her to write a statement that appellee had kidnapped and assaulted her. (A-1104). After the Grand Jury declined to indict appellee on the felonies, the remaining criminal charges filed against appellee were dismissed on June 24, 2016. (A-1104).

Officer Ardolino, who was designated to be appellee's "arresting officer," received 16 hours of overtime for the arrest of appellee. (A-1092-93).

**2. Basis for the Jury's Verdict**

The evidence presented at trial established that appellants unlawfully entered appellee's residence, failed to fulfill their duty to protect appellee's constitutional rights from being violated by their fellow officers, and maliciously prosecuted appellee.

Appellee was the first witness to testify at trial. In the Spring of 2015, appellee was in a relationship with Miranda. In June 2015, appellee noticed that Miranda was struggling with substance abuse and living on the street after her aunt, Miranda Lopez, threw her out of her home. (A-1119-21). Because Miranda had no place to live, appellee rented a room for her in a basement apartment at 393 Warwick Street in Brooklyn. (A-1122). Appellee stayed with Miranda a few days per week, and with his mother on other days. (A-1122-23).

During the evening of December 12, 2015, appellee received a call from Miranda, who was using her aunt Lopez's phone, asking appellee to pick Miranda up. Lopez lived half a block from 393 Warwick Street. (A-1132-33, 1141). Appellee informed Miranda that he would pick her up. (A-1134). Appellee and Lopez had texted each other earlier in the day because appellee could not reach Miranda. (A-1134). Appellee told Lopez that he loved Miranda and wanted to help her, as she recently had completed a drug detoxification program. (A-1134-38). Lopez was hostile to appellee and

falsely accused him of perpetrating domestic violence upon Miranda. (A-1139-40).

Appellee arrived at Lopez's home in the evening of December 12th, and observed Lopez and Miranda arguing. Lopez told Miranda that she was not leaving. (A-1142). Appellee stated he was leaving and would come back when the arguing stopped. (A-1143). After leaving, appellee ran into two friends, Desmonn Beckett and Anthony Modeste, and spoke with them. Approximately one hour later, Miranda called appellee again to pick her up. (A-1143-44). Appellee observed that Lopez was still yelling at Miranda. (A-1145). Miranda's face was injured and she was "high." (A-1145). Appellee testified that he concluded that Lopez injured Miranda as they were always fighting. (A-1147-48).

Appellee took Miranda to 393 Warwick Street where Miranda told appellee that she and her aunt had gotten into another fight. (A-1148). Miranda went to sleep and appellee went to sleep later. (A-1149). Miranda woke appellee up when she heard banging at the door. The appellants were at the door with guns and flashlights shouting, "Open the door, we know you're in there. Open the door." (A-1150). Appellee responded "What happened? Do you got a warrant? What is going on?" The appellants yelled, "Open the F'ing door before we [start] blasting." (A-1149-50). Appellee asked defendants again whether they had a warrant and appellants responded, "Open the door

before we start blasting." "They start[ed] kicking the door, boom, boom, boom." (A-1150). It was approximately 3:00 a.m. (A-1151).

Appellants kicked open the door and entered the apartment. Officer Ardolino grabbed appellee and told him to go upstairs. (A-1169-70). Appellee testified that he observed Officer Grieco in his home. (A-1170-71). Appellee testified that Grieco told him that he had been looking for appellee for a long time. (A-1172). Grieco told Officer Quattrocchi to handcuff appellee. (A-1175-76). Appellee asked Quattrocchi why he was being arrested and was told to "shut the fuck up." When appellee asked Quattrocchi whether he had a warrant, he responded "this is what I think of your warrant" and proceeded to use unnecessary force on appellee. (A-1178-79). The appellants then ransacked the residence. (A-1179).

Appellants took appellee to the 75th Precinct. (A-1186-87). Officer Grieco told appellee, "you know, you're never coming home. I'm going to make sure of that. I'm going to make sure you never come home." (A-1180, 1184).

Anthony Modeste and Desmonn Beckett, both of whom appellants arrested before going to appellee's apartment, were in the precinct, and Modeste informed appellee that appellants had found drugs in his home. (A-1187). Officer Grieco and the other appellants interrogated appellee, and Grieco told appellee that if he told him where he could find an illegal gun, he

9

would not charge appellee with kidnapping Miranda and would release him. (A-1191). Appellee said that he did not know anything about a gun and Officer Ardolino got angry and told appellee he was going to do 60 years for kidnapping, an "A" felony. (A-1192). Appellee was subsequently taken to Brooklyn Central Booking to await arraignment. (A-1192-93).

During his direct examination at trial, appellee was shown the Criminal Court Complaint and asked about the charges:

Q. Did you unlawfully imprison Samantha Miranda?

A. No.

Q. Did you commit criminal mischief against Ms.Miranda?

A. No.

Q. Were you harassing Ms. Miranda?

A. No.

Q. How about drugs? Were you in possession of a controlled substance?

A. No.

Q. Specifically, did you have four ounces of cocaine in your apartment?

A. No.

Q. How about 40 bullets? Did you have 40 bullets inside your apartment that night?

A. No.

Q. Were you charged with those bullets?

A. No.

Q. Did there come a time that you were told that there were bullets taken out of your apartment?

A. Yes, at my arraignment.

(A-1196-97).

Bail was set at appellee's arraignment in the amount of $100,000. (A-1197-99). Appellee was in custody at Rikers Island Correctional Facility until testifying before the Grand Jury, which declined to indict him. Appellee was released from custody the next day. (A-1199-1200, 1204). When appellee returned to 393 Warwick Street, it looked like a "tornado" had struck the place. (A-1205).

On cross-examination at trial, appellee denied that he offered to give Miranda money if he won this l case. (A-1214-16). The district court did not permit defense counsel to introduce an audio recording from a call from appellee to Miranda, when appellee was at Riker's Island, because it was not on appellants' trial exhibit list, and was not previously produced or disclosed to appellee during discovery or before trial. Appellants improperly attempted to spring the recordings upon everyone in the courtroom and play the recording in front of the jury. (A-1220-24, 1271).

Desmonn Beckett was appellee's next witness. (A-1277). Beckett testified that he observed Officer Grieco enter Anthony Modeste's residence at 399 Warwick Street on December 12 or 13, 2015, – approximately an hour before appellants entered the apartment at 393 Warwick Street, where appellee and Miranda were sleeping. (A-1287-1288, 1296). Beckett observed Officer Grieco exit the home with credit cards, marijuana and a white substance. (A-1289). Beckett identified the cocaine charged to appellee to be the white substance in a bag that Grieco had removed from Modeste's apartment at 399 Warwick Street. (A-1290).

Beckett testified that Officer Grieco took Modeste into custody and Officers Grieco and Ardolino inexplicably drove Modeste to the precinct – while claiming in this appeal that they possessed information that appellee had kidnapped Miranda and was holding her against her will just two doors away. (A-1291). Officer Schumacher and another officer searched Beckett's car without permission, and allegedly found a gun and a bullet. (A-1291-93). Beckett was arrested by appellants and charged with criminal possession of a weapon. (A-1285, 1292-93). Beckett was also taken to the precinct by appellants prior to appellants' illegal entry into 393 Warwick Street – though, again, appellants claim to have known at this time that appellee was holding Miranda against her will two doors away. (A-1292).

12

Officer Ardolino was appellee's next witness. Ardolino was asked a series of questions about why he and Grieco took Modeste to the precinct *before* entering 393 Warwick Street:

> Q. Why did you do the -- why did you take the prisoner back to the precinct instead of going to 393 to investigate further what was going on with Samantha Miranda?

> The Court: Now, I think the question is that you made a decision, I think this is what he's asking you, to take this prisoner back to police headquarters, I guess, instead of going directly into the house where Miranda was being held captive. I think that's the question. Is there a reason why you made that decision?

> A. At the time, with Ms. Miranda, nothing was verified yet. Everything was, to us, was important information that needed to be investigated and which we were currently investigating but nothing was verified. So at that specific time, there was a police action already occurring. (A-1333-34).

Officer Ardolino further testified that the allegations concerning appellee's conduct toward Miranda required an "immediate investigation," but not "immediate action," because the allegations were not "verified." (A-1320-21). Ardolino was also asked:

Q. When you were speaking with Ms. Lopez, did she tell you how long Samantha had been held at the location?

A. I don't remember a specific time frame.

Q. Did she say it was months, two months?

A. I'm sorry, sir. I don't remember.

Q. And once you saw the location, did you obtain a warrant?

A. No, sir.

Q. Did you immediately go into the location?

A. No, sir.

Q. You dropped off Ms. Lopez, right?

A. Yes, sir.

Q. And after you dropped off Ms. Lopez, did you go right back and go inside and rescue Samantha?

A. No, sir.

Q. In fact, you actually went back to the precinct, correct?

A. It's a possibility. I don't know the exact place we went after dropping Ms. Lopez off.

Q. Was anything preventing you from obtaining a warrant at that time, contacting the District Attorney's Office and explaining what you had learned? Did anything stop you from doing that?

A. No.

14

(A-1326). Ardolino received approximately 16 hours of overtime pay as a result of appellee's arrest. (A-1444-45).

Appellee's next witness was Samantha Miranda. (A-1346). Miranda testified that, in the Spring of 2015, she was in a relationship with appellee, with whom she has a child, and that she had a drug problem. (A-1348-49). In December 2015, Miranda was living at 393 Warwick Street. (A-1350-51) On December 12, 2015, Miranda was assaulted by a drug addict, Sal Imperato, causing her injury. (A-1350-51). After the attack, appellee went to her aunt Lopez's home. (A-1352). The aunt asked Miranda several questions including what happened to her face. (A-1352). Miranda's aunt used and sold illegal drugs. (A-1353). Miranda called appellee to pick her up. When appellee arrived, the aunt told Miranda that she was not leaving and that she was calling the police. (A-1353-54). Miranda and appellee went to 393 Warwick Street and went to sleep. (A-1355).

Miranda woke up when the appellants started banging on the door. Appellants entered by force, kicked open the door, arrested appellee, and ransacked the residence. Appellants did not acknowledge Miranda, walking right past her, without asking her if she needed assistance or medical treatment. (A-1355-59). Appellants questioned Miranda about guns in the residence, to which she replied there were none. (A-1360). Miranda testified that there were

also no illegal drugs, paraphernalia or ammunition in the residence. (A-1360-61, 1363). Miranda observed Grieco, Martinez, Ardolino, Quatrrocchi, and Schumacher in the apartment. (A-1552, 1671-72).

Miranda was taken to the 75th Precinct by Officers Grieco and Ardolino. (A-1365). Ardolino forced Miranda to write a statement that she was being held hostage by appellee and that appellee had assaulted her, in exchange for being released from custody. (A-1365-66, 1369). Miranda testified that she told appellants that she was not being held against her will, that appellee had not assaulted her, and that appellants were ordering her to write a false statement about appellee. (A-1366-67). After Miranda complied with appellants' commands, she was not permitted to return to her apartment at 393 Warwick Street. (A-1369).

When Miranda later went to 393 Warwick Street, she observed that appellants had "destroyed" the apartment. (A-1369). At the time of the Grand Jury presentation, Officer Ardolino directed Miranda to tell the District Attorney's Office that appellee had held her hostage, but Miranda told the Assistant District Attorney the truth – that she was being compelled to make false allegations against appellee and that appellee had not held her against her will. (A-1372-73).

16

## SUMMARY OF THE ARGUMENT

The verdict should be upheld. Appellants argue that appellee's unlawful entry claim should be dismissed because the record shows that it is undisputed that exigent circumstances were present. However, appellants testified at trial that there was no exigency, and there was other evidence presented at trial concerning appellants' conduct that would have led a reasonable juror to resolve the factual dispute in appellee's favor. Appellants also argue that the district court erred by not allowing them to present impeachment material, consisting of a recorded telephone conversation between appellee and Miranda. However, given the untimeliness of appellants' request to utilize the recording and failure to produce it to appellee during discovery and before trial, the district court correctly precluded it, but allowed appellants to elicit testimony that was the functional equivalent of the recording. Finally, appellants' arguments about the propriety of the jury charge are not supported by case law.

## ARGUMENT

### POINT I

### APPELLANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON APPELLEE'S UNLAWFUL ENTRY CLAIM

A party seeking judgment as a matter of law after trial has a high burden. As explained in *Graham v. City of N.Y.*, 128 F. Supp. 3d 681 (E.D.N.Y. 2015),

Rule 50 of the Federal Rules of Civil Procedure allows a court to set aside a jury's verdict if the court finds that 'a reasonable jury would not have a legally sufficient evidentiary basis to find' as it did. Fed. R. Civ. P. 50(a)(1), (b); *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (judgment as a matter of law is only appropriate 'when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.' (quoting Fed. R. Civ. P. 50(a)(1))). In reviewing a motion brought under Rule 50, '[t]he court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence,' bearing in mind that a jury is free to believe or disbelieve any part of a witness' testimony. *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007)); *Zellner*, 494 F.3d at 371. Accordingly, the court may 'disregard all evidence favorable to the moving party that the jury is not required to believe.' *Zellner*, 494 F.3d at 371 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). The moving party thus bears a heavy burden, especially where, as here, 'the jury has deliberated in the case and actually returned its verdict in favor of the non-movant.' *Cash*, 654 F.3d at 333 (internal quotation marks omitted); *Bakalor v. J.B. Hunt Transp., Inc.*, No. 11-CV-2911, 2013 U.S. Dist. LEXIS 88472, 2013 WL 3185546, at *1 (S.D.N.Y. June 24, 2013). 'A judgment notwithstanding the verdict may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it.' *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015)

(internal quotation marks omitted); *see also Cash*, 654
F.3d at 333.

*Id.* at 692.

Appellants argue in Point I of their brief that they had exigent circumstances which permitted them to enter appellee's home without a warrant, and that, in any event, they are entitled to qualified immunity, as no clearly established law would have compelled a reasonable officer to conclude that the entry was unconstitutional. According to appellants, "[t]he officers' subjective beliefs do not negate the undisputed facts establishing that there was substantial reason to believe that Miranda was in danger or threatened with serious injury." App. Br. at 26.

As on summary judgment, none of the appellants testified at trial that exigent circumstances existed, instead testifying that they were still investigating when they received the report from Marisol Lopez, Miranda's aunt, and subsequently entered appellee's residence without a warrant. Officer Ardolino testified that a "warrant was not needed and the investigation was still being investigated." (A-1550). Officers Quattrocchi and Schumacher did not testify that there was any emergency. In fact, Quattrocchi testified that, upon entering the residence, appellants did not request medical treatment for Miranda. (A-1647). Sergeant Martinez and Officer Grieco, the supervisors on

the scene, also testified that there was no emergency or urgency. (A-1685, 1692, 1833).

As further evidence that appellants were not presented with an emergency, the appellants took police action concerning other individuals before entering appellee's home. Before going to appellee's home – when appellant claimed to have known that appellee and Miranda were inside – appellants made a car stop and arrested Desmonn Beckett, entered and searched 399 Warwick Street, arrested Anthony Modeste, and took both men to the 75th Precinct for arrest processing. (A-1617-18, 1625-26, 1645, 1828-31).

Thus, there is ample evidence in the record that the jury had a reasonable basis to conclude that appellants, by their words and actions, did not have exigent circumstances to enter appellee's home without a warrant. Appellants argue that their actions were objectively reasonable, but the jury plainly did not credit the version of events put forward by appellants, particularly appellants' testimony as to what Miranda's aunt had told them before they entered appellee's home.  If the jury did not believe that Lopez told appellants that Miranda was being held against her will, or harming her, there could be no basis for a finding that appellants acted in an objectively reasonable manner in entering the residence without a warrant. *Mickle v. Morin*, 297 F.3d 114, 121 (2d Cir. 2002) (a court may not make a credibility determination and "embrace

defendants' versions of the circumstances as the basis for granting them judgment as a matter of law."). Specifically, the jury credited appellee's argument that appellants had given d false testimony about what Miranda's aunt had allegedly told them. (A-1980).

If a jury disbelieves a party or witness on one material issue, it is permissible for the jury to disregard the testimony of the party or witness as to other or all issues, such as appellants' testimony regarding what Miranda's aunt had told them. Moreover, appellants did not call the aunt as a witness at trial. As the district court stated in its post-verdict order, the aunt was "equally available" to all parties, (SPA-8), and "Defendants were inviting the jury to speculate as to what Lopez's testimony would have been, while avoiding any possible damaging effect from presenting [her] as a witness[.]" (SPA-9-10).

Appellants also argue that they had qualified immunity to enter appellee's apartment without a warrant because their actions were objectively reasonable. "[W]hen a defendant official invokes qualified immunity as a defense …, a court must consider two questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). It is well settled and clearly established that a police

officer cannot enter a residence without a warrant unless one of the exceptions to the warrant requirement exists. A court, however, cannot grant qualified immunity in this case because there were issues of fact concerning what the appellants knew and were told regarding the existence of exigent circumstances, which the jury resolved in favor of appellee. As stated above, if the jury did not believe that Lopez told appellants that Miranda was being held against her will, or harming her, there could be no basis for a finding that appellants acted in an objectively reasonable manner in entering the residence without a warrant *See Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991) ("Any question as to whether, if appellees Fourth Amendment rights were violated, the individual defendants have qualified immunity because they had a reasonable belief that, under the circumstances, their actions did not violate those rights, also rests on disputed questions of fact."); *Jones v. Treubig*, 963 F.3d 214, 231 (2d Cir. 2020) ("[D]isputed material issues regarding the reasonableness of an officer's perception of the facts (whether mistaken or not) is the province of the jury, while the reasonableness of an officers view of the law is decided by the district court."). In short, appellee's evidence at trial showed that appellants broke down the door to appellee's apartment and entered without consent, warrant, or the existence of exigent circumstances. (A-1178, 1356, 1415, 1417, 1430-31, 1563).

As the district court stated in its post-trial Order, dated September 8, 2023,

> Whether the Officers reasonably believed exigent circumstances existed here depends, at least, on (i) what information the Officers received via the 911-report and, later, from Miranda's aunt Marisol Lopez; (ii) what (if anything) police observed or heard at the apartment prior to their warrantless entry; and (iii) the credibility and relative weight assigned to Officers' testimony about when (if ever) they perceived there to be an 'emergency.' … Most of those facts remained disputed at trial. Although the officers received information from the 911 report and Marisol Lopez that Samantha Miranda was being held against her will, they processed two other arrests before proceeding to McClarin's apartment. While on Warwick Street, the officers came upon two individuals—Desmonn Beckett and Anthony Modeste— drinking whiskey. Modeste was standing on the sidewalk, while Beckett was sitting in the driver's seat of a parked car. As Beckett got out of the car, at least one officer saw a bullet on the floorboard. The car was searched and a firearm was found in the truck. Both men were arrested, Beckett for possession of a firearm and Modeste for an open-container violation. Ardolino recalled transporting one of the men to the 75th Precinct, while Quattrochi took the car and firearm. The time spent on these activities would have allowed ample time to obtain a warrant.

(SPA-3-4). Further, as the district court stated,

> At McClarin's apartment, Miranda denied that she was being held against her will. There was testimony that she had facial injuries, but the officers did not seek medical treatment for her. In sum, the evidence was sufficient to support a finding 'that Officers Grieco and Ardolino and Sergeant Martinez did not believe there was such an emergency, or that their belief was unreasonable.' Trial Tr. at 1008. The jury's resolution of that issue likewise

precludes qualified immunity. *See Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991) (noting that officers' entitlement to qualified immunity required 'a reasonable belief that, under the circumstances, their actions did not violate those [Fourth Amendment] rights').

(SPA-5).

The district court was correct. The record at trial demonstrates that appellants did not persuade the jury that they had exigent circumstances to enter appellee's home without a warrant, resolving the factual dispute on this issue against appellants. The jury's resolution of that issue likewise precludes qualified immunity. (SPA-5). Therefore, appellants are not entitled to judgment as a matter of law and the verdict of liability on appellee's unlawful entry claim should be sustained.

In footnote 3 in their brief, appellants contend that the district court also refused to provide the jury with special interrogatories to facilitate the qualified immunity analysis (A-1879-80, 2129), and that while that too was error, the appellants' entitlement to qualified immunity is nonetheless clear on this record.

Appellants' perfunctory argument on this issue, contained in a footnote without case law, should be disregarded by this Court and deemed waived. *See Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) ("It is a settled appellate rule that issues

adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. This rule has particular force where an appellant makes an argument only in a footnote.") (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) (internal quotation marks omitted)); *see also United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013); *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 83 n.1 (2d Cir. 2023). In any event, appellants have presented no case law in support of their argument that special interrogatories were required here, and, although appellants preliminarily raised the issue of special interrogatories with the district court and did not obtain a ruling (A-1879-80), appellants waived it by not mentioning it again until after the jury had issued its verdict. (A-2129).

> THE COURT: All right. Mr. Kalmbach, what is it that you wish to say?

> MR. KALMBACH: The first is that we would ask Your Honor to ask the jury which charges they found a lack of probable cause for malicious prosecution.

> THE COURT: Oh, you mean the questions that you posed to me in the interrogatories?

> MR. KALMBACH: I'll get to that in a second.

> THE COURT: All right. So I'm not going to – I didn't give the jurors those interrogatories. I don't think they were properly posed. They deal with more of the underlying issue of reliability to any discrete facts that would be relevant here.

> What is it now that you want?

> MR. KALMBACH: The second thing is pursuant to *Posr* that we discussed. We would ask that the jury be asked which charges Plaintiff proved a lack of probable cause for which criminal charges.
>
> THE COURT: No, I'm not going ask them that. What else – you can make your record, but I don't think they should really be burdened with anything else, okay?
>
> MR. KALMBACH: Okay.

(A-2129).

Based on the evidence at trial, the jury's rejection of appellants' claim that they had exigent circumstances to enter appellee's home, and the waiver of their request for special interrogatories, appellee's unlawful entry claim should be sustained. *See Emamian v. Rockefeller Univ.*, 823 F. App'x 40, 45 (2d Cir. 2020) ("A district court 'may grant a motion for judgment as a matter of law only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been *compelled* to accept the view of the moving party.' 'In ruling on such a motion, the court must bear in mind that the jury is free to believe part and disbelieve part of any witness's testimony.'") (quoting *Zellner v. Summerlin*, 494 F.3d 344, 370-71 (2d Cir. 2007)) (emphasis in original).

## POINT II

## APPELLANTS ARE NOT ENTITLED TO A NEW TRIAL ON APPELLEE'S UNLAWFUL ENTRY OR MALICIOUS PROSECUTION CLAIM

As explained in *Graham v. City of N.Y.*,

> Pursuant to Rule 59 of the Federal Rules of Civil Procedure, '[a] court may grant a new trial for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . .' *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012) (quoting Fed. R. Civ. P. 59(a)(1)(A)). Grounds for granting a new trial include a verdict that is against the weight of the evidence, *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003), substantial errors in the admission or exclusion of evidence, *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 203 (2d. Cir. 2014), prejudicial misconduct from counsel, *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992), and non-harmless errors in jury instructions, *United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011), or verdict sheets, *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 136 (2d Cir. 2005). A jury's verdict should 'rarely be disturbed' and a motion for a new trial should be granted only if the court is convinced that the jury's verdict is 'seriously erroneous or a miscarriage of justice.' *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) (per curiam); *see also Carroll v. Cty. of Monroe*, 712 F.3d 649, 653 (2d Cir. 2013); *Raedle*, 670 F.3d at 417-18. Such evaluations should be made with a 'high degree of deference . . . to the jury's evaluation of witness credibility . . . .' *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97-98 (2d Cir. 2014) (quoting *Raedle*, 670 F.3d at 418).

128 F. Supp. 3d at 692-93.

Appellants argue that "[e]ven assuming the officers are not entitled to judgment as a matter of law on McClarin's unlawful entry claim, a new trial is required on that claim as well as on appellee's malicious prosecution claim. On both fronts, the district court erred in withholding from the jury's consideration compelling impeachment evidence going to the heart of McClarin's account, his credibility, and the credibility of his main witness. Separately, the district court's multiple errors in putting the malicious prosecution claim to the jury supports a new trial on that claim." App. Br. at 28-29.

## 1. The District Court Correctly Precluded Appellants' Impeachment Evidence

The district court did not permit defense counsel to put into evidence an audio recording from a telephone call from appellee to Miranda, when appellee was at Rikers Island Correctional Facility, regarding an alleged offer of compensation to Miranda if appellee won this case. The audio recording was not on appellants' trial exhibit list and was not previously produced or disclosed to appellee during discovery or prior to trial. Appellants improperly attempted to spring the recordings upon everyone in the courtroom and play the recording in front of the jury. (A-1216-17, 1219-23, 1271). Appellants claim that this constitutes reversible error.

"It is well established that [t]he trial judge has broad discretion to exclude evidence not properly identified in the pretrial order." *Bedasie v. Mr.*

28

*Z Towing, Inc.*, No. 13-CV-5453 (CLP), 2016 U.S. Dist. LEXIS 57431, at *10 (E.D.N.Y. Apr. 29, 2016) (citation and internal quotations marks omitted); *Id.* at *8 ("[T]he Court finds that preclusion is an appropriate remedy. Defendants have offered no explanation for their failure to produce these documents at any earlier point in the litigation, despite the fact that the case has been ongoing for nearly three years."). "Courts abhor a trial by ambush." *Vijayanagar v. Krishna*, No. 3:18-CV-00553 (KAD), 2021 U.S. Dist. LEXIS 158608, at *15 (D. Conn. Aug. 23, 2021) (citing *Ginns v. Towle*, 361 F.2d 798, 801 (2d Cir. 1966) ("The basic purpose of the federal rules, particularly those concerning discovery and disclosure, is to eliminate trial by ambush[.]")); *see also Mawby v. United States*, 999 F.2d 1252, 1254 (8th Cir. 1993) ("We have said that the purpose of our modern discovery procedure is to narrow the issues, to eliminate surprise, and to achieve substantial justice. The rules are meant to [e]nsure that ... parties can obtain mutual knowledge of all the relevant facts gathered by both parties.") (internal quotation marks and citations omitted).

Appellants' tactics amounted to classic trial by ambush by attempting to surprise everyone in the courtroom by playing the audio recording. The district court properly precluded the recordings because appellants did not list them as trial exhibits in the joint pretrial order, the recordings were never produced to appellee, and the existence of the recordings was never disclosed.

(A-1220-24, 1271). Appellants have also not explained how they came into possession of the recordings, as appellee never received a copy of a subpoena, as required by F.R.C.P. 45(a)(4) ("[i]f the subpoena commands the production of . . . electronically stored information, . . . then before it served on the person to whom it is directed, a notice and a copy of the subpoena must be served on each party.").

Appellants also violated F.R.C.P. 26(b)(3) by failing to disclose prior statements of a party: "Any party . . . may, on request and without the required showing, obtain the person's own previous statement about the action or the subject matter." (A-1220).

Not only did the district court correctly not condone appellants' conduct, any error in this regard was harmless as the district court permitted appellants' counsel to ask questions about the recordings. Appellants' counsel inquired about whether appellee told Miranda "that she would get $300,000" if he won and appellee admitted that he "might have said I might let her control it." (A-1227-28). Appellee even explained "That's my child's mother. I always give her money . . . if I got it, that mean she got it, right?" (A-1228). The district court went on to permit multiple additional questions about the conversations. (A-1228-29). The district court also permitted inquiry of Miranda on the topic and she testified at trial that appellee promised her that she and their son would be "ok" if appellant prevailed. (A-1389).

The district court's reasoning in precluding the actual recordings was sound:

> Defendants filed a lengthy motion *in limine* on September 14, 2022. The parties filed their witness and exhibit lists the next day. Thus, at a pretrial conference on September 22, the Court was able make many evidentiary rulings, as a result of which the parties were able to revise their witness and exhibit lists. At a second conference on September 23, the Court made additional rulings. Unfortunately, however, Defendants did not list the recording as an exhibit. Nor did their extensive motion in limine seek a ruling on what was sure to be an objection to the recording. Instead, Defendants made 'a conscious decision . . . not to tell [opposing] counsel about it or not to put it forward on a proposed exhibit list.' Trial Tr. at 200-01. Their counsel defends his decision on the ground that he was not required to disclose impeachment material. It is true that the Court's individual rules state that each party is to submit '[a] list . . . of exhibits to be offered in its case in chief.' But the same rules state that '[o]nly exhibits listed will be received in evidence except for good cause shown.' The Court's extensive explanation of its pretrial process should have alerted counsel to err on the side of caution or, at the very least, to bring any confusion about what was expected to the Court's attention prior to trial. Regardless of the strictures of the Court's rules, there is a broader principle at stake. Trial by ambush has long since fallen out of favor.

(SPA-13-16). The district court further explained,

> Defendants' counsel had the recording well in advance of trial before trial and undoubtedly knew (1) that it was

31

going to be a key part of his cross examination and (2) that opposing counsel would object to its admission. By failing to disclose it, he subverted the entire purpose of the Court's pretrial process. Despite every opportunity to address the issue earlier, he chose to wait until the last possible minute to spring the trap. This struck the Court as a fundamentally unfair ambush. Nothing in Defendants' motion for a new trial convinces it otherwise. In any event, the jury heard other evidence regarding the phone calls. In addition to McClarin's own acknowledgment of some of his statements, Miranda testified that he said '[s]omething, like, about, like, if you go and, like, we win, this is what will happen and, like, you and my son would be okay.' Trial Tr. At 328. She did not understand the statement as an offer of money in exchange for her testimony, but that 'he said that because he knows it's nerve racking [sic] for me to be here.' *Id.* Their testimony, coupled with extensive evidence of the history of their relationship, allowed the jury to make a fair assessment of Miranda's credibility.

(SPA-17-18).

Thus, appellants are not entitled to a new trial because they acted improperly by failing to disclose the impeachment material and the jury heard the substantial equivalent of the recordings during the testimony of Miranda and appellee, rendering any error harmless.

## 2. Appellants are Incorrect that "A Series Of Overlapping Errors On McClarin's Malicious Prosecution Claim Provide a Separate Basis for a New Trial on that Claim"

Appellants argue that "[t]he district court also committed a constellation of errors when putting McClarin's Fourth Amendment malicious prosecution claim to the jury. Any one of those errors—in isolation—might not have been

reversible error. But together, they deprived the officers of a fair trial." App. Br. at 37-38. Appellants are incorrect.

### A. The District Court Did Not Fail to Provide a Proper Causation Instruction to the Jury.

Without citing any governing case law, appellants argue that the district court erred because the jury "was never tasked with determining whether McClarin's five-day detention was *caused* by his being charged [with] one or more crimes unsupported probable cause." App. Br. at 39 (emphasis in original). Further, appellants argue that "the jury may not have agreed with the officers' position that probable cause on any one of felonies would have independently justified the seizure, but the officers were entitled to have the jury decide that question." *Id.* at 39-40. Not only have appellants cited no governing case law in support of this argument, but the jury, by virtue of its verdict after analyzing the felony charges, obviously determined that there was no probable cause for *any* of the felony charges, which established that the deprivation of liberty was caused by the false charges. Thus, appellants' argument was mooted by the jury's verdict that there was no probable cause for the prosecution – and further confirmed by the substantial punitive damage awards against appellants.

Appellants further argue that "[p]robable cause for any one of the serious felonies identified for the jury would have supported setting bail and

the relatively brief post-arraignment detention." App. Br. at 43. There is nothing in the record or the applicable law that supports this argument. Further, it would have been legally improper to task the jury with speculating whether probable cause for any of the felonies, independent of the other felonies, caused the deprivation of liberty. Making such a determination would have been speculative, outside the knowledge of the jury, and not based on the evidence presented at trial. In any event, this argument was waived because it was not raised at the charge conference. (A-1936-37). Further, appellants consented when the district court stated, "I'm going to tell them that there's no question about the fact that he did suffer a loss of liberty." (A-1937).

### B.     The District Court Did Not Fail to Provide a Probable Cause Charge Appropriately Tailored to the Case.

Appellants argue next that the allegedly improper jury charge made it "entirely possible that the jury found that probable cause was lacking for some of the charges, but not all of them." App. Br. at 42. Appellants have cited no case law in support of their argument, they are speculating regarding what was in the juror's minds, and their argument is moot because the jury found that there was no probable cause for *any* of the felony charges filed by appellants against appellee. Appellants contend that "[p]robable cause for any one of the serious felonies identified for the jury would have supported setting bail and the relatively brief post-arraignment detention. But the jury could have

reasonably believed that district court's instruction required it to render a verdict for McClarin if probable cause was lacking for any one felony." App. Br. at 43. There is simply nothing in the record that supports appellants' contention that this was in the mind of the jury.

## C. The District Court Did Not Err by Not Asking the Jury to Specify the Charges it Found Were Unsupported by Probable Cause.

Appellants' final argument is that the district court should have asked the jury to "specify which charges they found were unsupported by probable cause—as the officers had requested." App. Br. at 43-44 (citing A-1816). There is nothing at this page in the Appendix that pertains to appellants' argument. Trial testimony appears at A-1816. In any event, appellants cite no case law that the use of a general verdict form that did not separate the felonies filed against appellee amounts to reversible error. This Circuit "recognize[s] that the use of interrogatories is a matter for the judge's discretion." *Stephenson v. Doe*, 332 F.3d 68, 81 n.19 (2d Cir. 2003). Even if appellants properly and timely requested special interrogatories, the district correctly determined that the issues presented to the jury were simple enough that a general verdict form was suitable.

Appellants, citing *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991), argue that the district court erred by not "asking the jury to specify which charges they found were unsupported by probable cause—as the officers had

requested." App. Br. at 33-34. Consequently, as argued by appellants, the Court will "'never know which charge or charges the jury may have found to have lacked probable cause.'" *Id.* (citing *Posr* at 100). *Posr* does not pertain to this case. In *Posr*, this Court stated that "[w]hen the jury in this case asked whether a probable cause finding as to one of the charges would amount to a finding for all three, we can assume that they were willing to find probable cause on one of the charges, but not the other two." *Id.* at 100. Accordingly, this Court ordered a retrial on Posr's malicious prosecution case. In this case, however, there is no confusion – the jury found that there was no probable cause for *any* of the felony charges filed after being charged as follows: "Now, probable cause that someone committed one crime does not mean that there was probable cause for another crime. Probable cause for each crime must be evaluated separately. Mr. McClarin must prove by a preponderance of the evidence that Officers Ardolino and Grieco lacked probable cause to believe that he committed any of the crimes I just defined for you." (A-773). The jury's verdict was a repudiation of appellants' assertions, showcasing the jury's disbelief in appellants' testimony and finding that there was no probable cause for *any* of the charges. This was confirmed by the substantial punitive damage award against appellants based on their conduct toward appellee in entering his home without a warrant, ransacking the residence, coercing Miranda to make

false allegations against appellee, commencing a bogus prosecution, and continuing their false testimony about what Miranda's aunt told them in the civil trial.

Finally, in the other case cited by appellants, *Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020), this Court explained that special interrogatories may be utilized in order for the court to determine qualified immunity after the jury resolves the factual disputes relevant to the defense. *Id.* at 232-33 ("In situations where the court may not be able to discern from the general verdict how the jury may have resolved a particular disputed issue that is a dispositive part of the step-two *Saucier* [qualified immunity] analysis, it is necessary (as the district court did here) to ask additional questions to the jury through special interrogatories."). However, appellants' argument, contained in pages 43-44 of their brief, does not discuss the doctrine of qualified immunity, but rather the general verdict form that did not ask the jury its findings as to each of the felony charges. Thus, *Jones* is not applicable.

Because the jury found that there was no probable cause for *any* of the felonies submitted to the jury to evaluate, the appellants are responsible for the loss of liberty suffered by appellee, as any or all of the serious felonies would have resulted in bail being set.

Thus, appellants are not entitled to a new trial on appellee's unlawful entry or malicious prosecution claims.

## <u>CONCLUSION</u>

For the foregoing reasons, the verdict should be upheld.

Dated:   April 16, 2024

<div style="margin-left: 50%;">

<u>/s/ Eylan Schulman</u>
EYLAN SCHULMAN, ESQ.
MOSKOWITZ COLSON
GINSBERG & SCHULMAN
80 Broad Street, Suite 1900
New York, NY 10004
(212) 257-6455

MICHAEL HUESTON
Attorney at Law
16 Court Street, 35th floor
Brooklyn, New York 11241
(718) 246-2900
mhueston@nyc.rr.com

RICHARD CARDINALE
Attorney at Law
26 Court Street, Suite # 1504
Brooklyn, New York 11242
(718) 624-9391
richcardinale@gmail.com

</div>

## <u>Certificate of Compliance with F.R.A.P. 32</u>

It is hereby certified that the annexed Brief of Plaintiff-Appellee Justin McClarin is in compliance with Federal Rule of Appellate Procedure 32 and with the local rules of the Second Circuit. The brief was printed in 14-point proportional font and, including footnotes and headings, contains 8,617 words.

Dated: New York, New York
        April 16, 2024

/S/ Eylan Schulman

_____

Eylan Schulman